Bodie C. PRYOR, Plaintiff-Appellee,

v.

GULF OIL CORPORATION, Defendant-Appellant.

No. 81–2249.

United States Court of Appeals, Fifth Circuit.

May 19, 1983.

Roger P. Balog, Joan B. Oxford, Houston, Tex., for defendant-appellant.

Joseph R. Steele, Stephen M. Rienstra, Port Arthur, Tex., for plaintiff-appellee.

Before THORNBERRY, JOHNSON and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal in a Texas diversity case from a judgment rendered for Pryor, a retired employee of Gulf, awarding Pryor additional pension benefits from Gulf. Pryor claimed Gulf breached an agreement

it made with him respecting his pension benefits. Because the instructions given the jury respecting the nature of the agreement were prejudicially insufficient, misleading, and confusing, and because the jury verdict produced by these instructions is ambiguous as to the terms of such an agreement, we reverse and remand the case for a new trial.

## I.

Appellant Bodie C. Pryor ("Pryor") began working at a synthetic rubber plant in Port Neches, Texas, on October 4, 1942. This plant was owned by the United States Government, but was operated by B.F. Goodrich Company ("B.F. Goodrich"), which was Pryor's employer. In 1955, B.F. Goodrich and appellant Gulf Oil Corporation ("Gulf") formed a partnership, known as Goodrich-Gulf Chemical, Inc. ("G–G"), and bought the Port Neches plant from the United States. Pryor transferred his employment to G–G and continued to work at the plant. In 1960, G–G built a polyethylene plant as part of its Port Neches facility. Pryor was made manager of operations at the polyethylene plant,[1] and he held this position until 1965, when, because of a disagreement between B.F. Goodrich and Gulf, the decision was made to shut down the polyethylene plant.

In February 1965, after this decision was made, the works manager for the Port Neches facility, W.R. Bateman, and the vice president of G–G, E.E. Mitchell, told Pryor that he could (1) stay on at the synthetic rubber plant as an employee of G–G, (2) transfer to Gulf's polyethylene plant at Orange, Texas, which Gulf had purchased from Spencer Chemical Company ("Spencer") in November 1963,[2] or (3) quit.

Pryor was interested in transferring to Gulf's Orange plant, but he was afraid that as a result of the transfer he might lose service-related benefits, including future pension benefits under a B.F. Goodrich Pension Plan (the "B.F. Goodrich Plan"), to which he had contributed, from his wages, since 1942.[3] Thus, in February 1965, Pryor sought assurances from the officials of Gulf's Spencer Chemical Division that if he transferred to its Orange plant that he would retain his employee benefits.

Pryor first talked with Mitchell and Bateman, and then with Pat Jarratt, plant manager at the Orange facility, about "whether I was going to continue to get all of my employment benefits, if I moved there." As a result of his conversations with these men, Pryor was asked to go to Kansas City to talk with the top officials of Gulf's Chemical Division about his service benefits.

In Kansas City, Pryor talked with four officials: Jack Denton, president of the division; Gene Frederick, vice president in charge of plant operations; Jack Pyle, Denton's "Number 2 Man"; and Virgil Hanson, director of personnel. At trial, Pryor testified that Denton "assured me I would get my benefits and that also, I had a very bright future with Gulf Oil-Chemicals Company." Gene Frederick "gave me the same assurance." Pryor did not recall the conversation he had with Pyle. However, as to Hanson, Pryor testified that he asked him "if I'm going to get my employment benefits when I transfer over to the Orange plant and I want to know whether or not Gulf really wants me to move over there under those conditions." Pryor said that Hanson eventually told him, "I know you will get these benefits."[4]

---

**1.** Before becoming manager of operations at the polyethylene plant, Pryor was the technical manager at the synthetic rubber plant.

**2.** After its purchase by Gulf, Spencer Chemical Company became Spencer Chemical Division of Gulf Oil Corporation.

**3.** In 1969, B.F. Goodrich became the sole owner of G–G. The G–G pension plan in which Pryor had participated was merged into the B.F.

Goodrich Plan in 1971. The B.F. Goodrich Plan also included Pryor's participation from 1942 to 1955, throughout which time the synthetic rubber plant at Port Neches was operated solely by B.F. Goodrich and Pryor was a B.F. Goodrich employee.

**4.** On cross-examination, Pryor testified that his conversations with Hanson were of a specific nature, and that Hanson, in effect, told him: "You will get all of the pension benefits—em-

After his return from Kansas City, Pryor received the following letter, dated February 25, 1965, from Jarratt:

"Dear Mr. Pryor:

"It was a pleasure visiting with you again today and exploring a possible alignment with Gulf's Spencer Chemical Division.

"We are very pleased to make you an offer of $1300 per month in our Operations Department under Mr. Kowalik. You may consider this in terms of the specific job we discussed verbally, but which is at this moment not open and, therefore, not to be publicized. Tentatively, the effective date we suggest is April 1. If, for any reason, this works a hardship on you, we will be glad to discuss a different time, whether it be sooner or later.

"*We are also very pleased to state that your service related benefits will be recognized by Gulf, although the specific details of this provision are yet to be developed.*

"Gulf, through its Spencer and other Divisions, has under active and very promising study a number of possibilities in the Plastics field including linear polyethylene, acrylics and others, and the challenges and potential growth that await people with your capabilities are very exciting. We hope you will choose to participate with us in this growth.

"May we hear from you soon.

"Yours very truly,
"Pat Jarratt
"Works Manager"

(Emphasis added.)

Pryor, relying on the oral and written representations made to him by all of the aforementioned officials, accepted the offer of employment by letter dated March 4, 1965:

ployee benefits, including pension back to the time you went to work with Goodrich and Goodrich-Gulf."

5. Pryor never joined the Spencer Plan, probably because matters respecting the pension plans for the Orange plant employees were in a state of transition when Pryor became employed there, as is indicated by his trial testi-

"Dear Mr. Jarratt:

"It was a real pleasure to receive your offer of a position with Spencer and I gladly accept it. I am now looking forward to getting acquainted with the other Spencer employees and with the job. My visit with the Spencer people in Kansas City was most enjoyable.

"The future of the Chemical Division does look very bright and I want to be a part of this growth. I will do my best to satisfy Mr. Kowalik and yourself.

"I will keep you posted on when I can make the transfer. The date of April 1, looks good now.

"Yours very truly,
"Bodie C. Pryor"

Pryor began working at the Orange plant on April 1, 1965.

As of 1965, the Gulf Benefits Program (the "Gulf Plan") provided that no Gulf employee could join it if he or she were entitled to belong to any other such plan. The employees at the Orange plant had their own pension plan, known as the Spencer Plan. In 1965, Gulf decided to freeze the Spencer Plan, and to bring all the Orange plant employees into the Gulf Plan. Accordingly, the employees at the Orange plant became eligible to participate in the Gulf Plan effective January 1, 1966. Pryor joined the Gulf Plan as of that date.[5]

Beginning in 1966, Pryor, as a member of the Gulf Plan, received annual statements from Gulf respecting his contributions to it. These statements reflected that Pryor's "time service" was calculated from October 4, 1942, the day he began working for B.F. Goodrich, and that his "benefit service" was calculated from January 1, 1966, the day Pryor joined the Gulf Plan. The evidence at trial showed that "time service" was the figure used to determine an employee's se-

mony. In any event, there is no evidence that Pryor ever made any contributions to the Spencer Plan or sought to become a part of it. Pryor does not complain of any improper prejudice to his pension benefits on account of his not being in a plan from April 1, 1965 to January 1, 1966, and we disregard this brief hiatus.

niority, vacation, sick leave, insurance benefits, and the like; whereas "benefit service" was the figure used to determine the dollar amount of an employee's pension benefits on retirement. The annual pension statements sent Pryor stated that, "If you question any item on your statement, please consult your supervisor so that it can be verified and corrected." Pryor made no complaints regarding his benefit service date or any other information on these statements to any Gulf official.

On August 1, 1978, Pryor officially retired from Gulf.[6] Upon his retirement, he began receiving pension benefits under the Gulf Plan based on a benefit service date of January 1, 1966. Pryor also became eligible to receive a pension from the B.F. Goodrich Plan based on his twenty-three years of benefit service with B.F. Goodrich and G–G. Shortly thereafter, he filed suit against Gulf, claiming that Gulf had agreed that he would not lose pension benefits as a result of his transfer from G–G to Gulf, and that Gulf had violated this agreement. In his complaint, Pryor alleged that his retirement pension under the Gulf Plan was $451.88 a month, which was based on twelve years and seven months of service; that he would receive $327.07 a month under the B.F. Goodrich Plan for his some twenty-three years there; that the minimum pension received by a B.F. Goodrich employee with his nearly thirty-six years of service (1942–1978) would be $1,250 a month; and that Gulf, under its agreement with him, therefore owed him "the minimum additional sum of $450.00 per month," which was the approximate difference between the pension he would have received had he remained under the B.F. Goodrich Plan until retirement and the total of the benefits he

was actually receiving from both the B.F. Goodrich Plan and the Gulf Plan.[7]

Thus, the theory of recovery advanced by Pryor in his complaint was that he and Gulf made an agreement, the terms of which provided that Gulf would pay him the difference between what he would have received, had he remained a B.F. Goodrich employee, *under the B.F. Goodrich Plan* for thirty-five years and ten months (1942–1978) based on his actual salary at the relevant times, and the total of what he actually was receiving from both the Gulf Plan and the B.F. Goodrich Plan. At trial, however Pryor altered his theory in a crucial respect. There, Pryor apparently sought the difference between what he was actually receiving from the B.F. Goodrich and the Gulf Plans and what a Gulf employee with thirty-five years and ten months of benefit service *under the Gulf Plan* would have been eligible to receive.

Gulf defended Pryor's action primarily on four defensive theories: first, that no agreement entitling Pryor to additional pension benefits whatever existed between the parties; second, that the Gulf officials who dealt with Pryor had no authority to make any such agreement claimed by Pryor; third, that Pryor waived any such agreement by failing to object to the benefit service date reflected on the annual pension statements sent to him by Gulf; and fourth, that if a valid and enforceable agreement did exist its terms were not that Pryor would be given credit for benefit service under the Gulf Plan back to 1942, but rather that by transferring to Gulf Pryor would not lose any pension benefits under the B.F. Goodrich Plan, or that the Gulf Plan pension benefits which Pryor would receive on retirement would be such

---

**6.** Pryor had actually retired approximately six weeks earlier.

**7.** The alleged $451.88 from the Gulf Plan plus the alleged $327.07 from the B.F. Goodrich Plan equal $778.95, which is $471.05 less than the $1,250 a month Pryor alleged would be received under the B.F. Goodrich Plan for thirty-five years of service.

The record shows that based on twelve years and seven months of benefit service under the

Gulf Plan, Pryor was entitled to a monthly benefit of $467.40, but that because he chose an option that would provide a lump-sum payment to his wife upon his death, the monthly benefit was reduced to $395.82. Under the B.F. Goodrich Plan, Pryor was entitled to receive $398.87 a month, but because Pryor chose an option similar to that he exercised under the Gulf Plan, his B.F. Goodrich Plan payments were reduced to $363.77.

that, when added to what Pryor would receive under the B.F. Goodrich Plan for his 1942–1965 service, the total of Pryor's actual receipts under both plans would not be less than what Pryor would have received under the B.F. Goodrich Plan alone had he continued under it (at whatever salary level he would be at from time to time with Gulf) until the time of his final retirement, instead of transferring to Gulf.[8]

Both parties voluntarily consented to a trial presided over by the United States Magistrate for the Beaumont Division of the Eastern District of Texas. The district court, therefore, transferred the cause to the magistrate for trial and entry of final judgment under 28 U.S.C. § 636(c).

Although neither party moved for a separate trial of any issues, the magistrate determined, apparently during the course of the trial, that the damage issues, which he believed would be strictly of an objectively computational nature, would subsequently be separately tried to him without a jury, while the matters respecting the existence of a valid agreement would be submitted to the jury. He seemingly believed that this would adequately provide for the resolution of all issues in the case.

Gulf tendered to the magistrate proposed interrogatories to the jury, but the magistrate submitted the case to the jury in a form calling for a general verdict. The jury found for Pryor and against Gulf, and the case proceeded to its second phase, which, given the effect of the jury verdict as apparently interpreted by the magistrate, concerned only the determination of the additional pension benefits due Pryor based on thirty-five years and ten months of benefit service *under the Gulf Plan*.[9] At a nonjury hearing on October 22, 1980, Pryor sought, as damages, the difference between the total amount of retirement benefits he was currently receiving under the B.F. Goodrich and the Gulf Plans combined and the amount a Gulf employee with thirty-five years and ten months of benefit service would receive under the Gulf Plan. Pryor himself testified that a Gulf employee with thirty-five years and ten months of benefit service, with a similar salary history, would be eligible to receive $1,192 a month under the Gulf Plan. The magis-

---

8. The statute of limitations and laches were also pleaded by Gulf, and set forth in its proposed interrogatories to the jury. However, this defense was not submitted to the jury and Gulf made no objection to the magistrate's failure to submit it. We note, however, that if Pryor's version of the agreement, as apparently contended by him at trial, was that Gulf promised him a Gulf Plan pension based on benefit service back to 1942, then a serious question arises as to whether his cause of action was barred by limitations since the evidence establishes that Pryor was aware as early as 1967 that *the Gulf Plan was only crediting him with* benefit service from January 1, 1966. If, however, the agreement were not that the Gulf Plan, as such, would credit Pryor with benefit service back to 1942, but that Gulf itself (rather than the Gulf Plan) would pay a separate retirement supplement to him equal to the difference between the total Pryor would receive under both the Gulf Plan for his years with Gulf after 1965 and under the B.F. Goodrich Plan for his 1942–1965 service, on the one hand, and, on the other hand, the amount he would have received under the Gulf Plan with 1942 Gulf benefit service, then there would have been no breach by Gulf before Pryor's retirement. Alternatively, if the agreement were that Gulf itself would pay Pryor a separate retirement supplement

equal to the difference between what he would actually receive from his combined pensions under the B.F. Goodrich Plan and the Gulf Plan and what he would have received under the B.F. Goodrich Plan alone had he remained under it until retirement, then his cause of action also would not be barred since, again, there would have been no breach before Pryor's retirement.

9. Since the magistrate apparently interpreted the jury's verdict to mean that Gulf was obligated to give Pryor credit for thirty-five years and ten months of benefit service *under the Gulf Plan,* then the issue of breach was undisputed, since Gulf had always admitted that Pryor's pension benefits under the Gulf Plan had been computed on twelve years and seven months of benefit service. However, if the magistrate had construed the verdict to mean that Gulf promised Pryor he would not lose any pension benefits by transferring to Gulf, or would receive as much under the B.F. Goodrich Plan and the Gulf Plan combined as if he had remained under the B.F. Goodrich Plan until his retirement, then evidence respecting whether the agreement was breached would have been necessary and an appropriate finding thereon required.

trate received this testimony, but did not then render a judgment as to damages.

Thereafter, on November 24, 1980, the magistrate entered an order requiring the parties to show cause why an expert should not be appointed by the court to assist it in determining the amount of pension benefits due Pryor under the Gulf Plan. On January 9, 1981, the court appointed Wilson Pate, the manager of human resources at Gulf's Orange facility, as its expert. The magistrate then held another nonjury hearing on January 20, 1981, where Pate appeared and computed Pryor's benefits. Based on Pate's testimony,[10] the magistrate

rendered judgment for Pryor and decreed that Gulf pay him the additional sum of $642.01 a month beginning August 1, 1978, the day Pryor retired, up to one month after the entry of judgment, and that Gulf should thereafter pay Pryor $1,109.41 a month, which was the amount an employee with thirty-five years and ten months of benefit service (at Pryor's actual salary) would have received under the Gulf Plan. The magistrate, however, allowed Gulf no offset or reduction for the amount received, and which would continue to be received, by Pryor under the B.F. Goodrich Plan, even though Pryor himself conceded that Gulf was entitled to such offset.[11]

**10.** Gulf introduced into evidence the deposition of Juanita Davis, whose testimony showed that Pryor was actually receiving more benefits under the B.F. Goodrich and the Gulf Plans combined than he would have received from the B.F. Goodrich Plan had he remained a B.F. Goodrich employee and contributed to its Plan until retirement. Her testimony was, of course, consistent with Gulf's version that in any event Pryor had never been assured more than this. Mrs. Davis's testimony had been previously excluded at trial either because the issue being tried at that point was the existence of a valid and binding agreement or because it was felt that her testimony went only to damages, it is not fully clear which. In any event, once the magistrate had interpreted the jury verdict as having found an agreement based upon Pryor's ultimate version of its terms, such testimony was immaterial to the issue of damages. That it was received by the magistrate is further evidence of the confused state of the trial.

**11.** Even if the instructions given the jury had been proper and the verdict produced by the jury unambiguous, we would still be required to reverse the judgment of the magistrate because of his failure to give Gulf an offset in the amount of the benefits Pryor had received, and would continue to receive, under the B.F. Goodrich Plan.

As indicated in the text, Pryor's complaint (which was never amended) proceeded on the theory that he was entitled to the difference between what he was receiving under the B.F. Goodrich Plan and the Gulf Plan combined and what he would have received under the B.F. Goodrich Plan for service from 1942 to 1978. At the October 22, 1980 hearing before the magistrate, Pryor testified, under direct examination by his counsel, that an employee with his wage history and thirty-five years and ten months of benefit service under the Gulf Plan would have received a Gulf Plan pension payment of $1,192 a month and that:

"Q. You show that your time service date with Goodrich Gulf was October 4th, 1942 [actually it was B.F. Goodrich until 1955].
"A. That's right, sir.
"Q. You show that your time service date with Gulf Oil was April the 1st, 1965; is that correct?
"A. That's what I show, sir, there is a little gap in there, but that's what I show.
"Q. And your retirement date was August the 1st of 1978 from Gulf Oil Corporation?
"A. That's right.
"Q. And that is a total of thirty five years and ten months combined years of benefit service, is that right?
"A. That's correct.
"Q. Now you are currently receiving from Goodrich Gulf the amount of three hundred sixty three dollars and seventy seven cents per month, is that correct, sir?
"A. That's right.
"Q. And you're currently receiving from Gulf Oil based on twelve years and seven months, three hundred ninety five dollars and eighty two cents, is that correct?
"A. That's right.
"Q. *That is a total of Seven Hundred fifty nine dollars and fifty nine cents total pension benefit that you receive combined from Goodrich Gulf and Gulf Oil Corporation?*
"A. *That's right, sir.*
"Q. And it's your position that *you are entitled* according to the verdict of the Jury based on thirty five years and ten months of service *to a monthly figure of One Thousand, one hundred ninety two dollars per month,* is that correct, sir?
"A. *That's right, sir.*
"Q. And you do acknowledge the fact that that Gulf is entitled to credit for the amount that you received from Goodrich and they are entitled to credit for the amount, the lesser amount you have been paid since retirement based on twelve years and seven months, is that correct?

## II.

Gulf raises several claims of error on appeal. As we uphold one of these, namely, its complaint of the charge to the jury, it is not necessary that we rule on the others, since in any event there must be a retrial and we do not believe the matters complained of are likely to recur.[12] However, discussion of the facts relating to one of these other contentions, namely, Gulf's complaint concerning the bifurcated nature of the trial, forms an appropriate background for our consideration of the jury charge.

One focus of Gulf's complaint about the separate trial is the method by which it was ordered. Neither party ever requested a separate trial, and no order so providing was entered prior to trial. Gulf directs our attention to language in *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1324 (5th Cir.1976), where this Court stated that:

> "The use of this trial procedure must be grounded upon a clear understanding between the court and counsel of the issue or issues involved in each phase and what proof will be required from one phase to the next."

So far as the record before us reflects, the first ruling that the trial would be bifurcated arose during the cross-examination of James Chappell, manager of benefits interpretation for Gulf, when he was asked by Pryor's counsel to compute how much Pryor would have received under the Gulf Plan if he were given credit for thirty-five years and ten months of benefit service.[13] The magistrate excluded the evidence, stating in the presence of the jury:

> "[T]he Court does not see where that is material to this cause of action. *The Court is, unless somebody shows me different, is going to submit only the issue of whether or not he had a contract to the jury."* (Emphasis added.)

Later, during Gulf's direct examination of Juanita Davis, manager of benefits administration for B.F. Goodrich, the magistrate excluded similar evidence.[14] Mrs. Davis was asked to compute the monthly pen-

---

"A. I'm willing to exceed [concede] that.
"Q. *So that is a difference per month you feel you are owed according to the verdict of the jury Four Hundred thirty two dollars and forty one cents per month.*
"A. *That's right, sir."* (Emphasis added.)

**12.** Among Gulf's complaints is that the magistrate abused his discretion in denying, as untimely, Gulf's request, made some seventeen days prior to trial, that it be allowed to further amend its answer to raise the defense of the Texas Statute of Frauds. We assume that on timely and proper request following remand Gulf will be allowed to file such an amendment. We intimate no views as to the merits of a Statute of Frauds defense here.

Gulf also asserts that there is no evidence showing that its officials, who allegedly made the agreement with Pryor, had any actual or apparent authority to make such an agreement. However, as indicated in note 8, *supra,* this contention, like that concerning limitations, depends for its force on the assumption that the agreement in question was for a change in benefits to be paid by the Gulf Plan, as opposed to Gulf agreeing to itself (not the Gulf Plan) pay Pryor additional monthly sums during his retirement such that the total of those sums plus what he would receive under both the Gulf Plan, for his actual service there, and the B.F. Goodrich Plan, for his actual service there, would be at least equal to the agreed amount,

namely, the amount Pryor would have been entitled to if all the years of his service from 1942 to retirement were credited under either (i) the B.F. Goodrich Plan (Pryor's original theory and that claimed by Gulf, if there were any agreement) or (ii) the Gulf Plan (Pryor's ultimate theory). While a difficult question as to apparent authority might be presented respecting any agreement which would necessarily entail a modification of the Gulf Plan, Pryor's theory was not so restricted, and we hold that Gulf was not entitled to an instructed verdict on the issue of apparent authority. We also note that neither the Gulf pension plan nor its trustees were made a party to the suit.

**13.** Pryor, in his brief, states that the matter of separate trial was discussed at the pretrial conference. We also note that in his opening statement to the jury, Pryor's counsel stated, "I do not believe that the Court will call on you, any amount of money in regard to damages," and that Pryor rested his case without producing any evidence respecting whether the agreement Pryor contended existed was breached and the damages which resulted from the breach. No transcript of the pretrial conference has been included as part of the record on appeal; no pretrial order or minute entry of record refers to the matter of separate trial.

**14.** *See* note 10, *supra.*

sion which Pryor would have been entitled to receive had he retired with thirty-five years and ten months of benefit service under the B.F. Goodrich Plan. Pryor's counsel objected, stating:

"... the Court wouldn't let me go into awhile, the field for damages, and we would make an objection. *We're here to determine whether there was a contract or whether there was not."* (Emphasis added.)

Gulf's counsel replied:

"MS. OXFORD: ... *I'm indicating that he has not lost anything by his transfer to Gulf.* If he had stayed with Goodrich, his benefit would be less than it is today, and furthermore, we have already shown that." (Emphasis added.)

The magistrate ultimately sustained the objection, stating:

"*This gets into the damage element.* The Court has already prohibited it. I am sure the lady could compute it, *but the Court's not going to submit any damage issue to this jury,* so there is no need to prove it up, or what he would receive.

"We'll have to let her decide—*depending on what this jury does, she can compute it and submit it to the Court and the Court, in all probability, will accept it."* (Emphasis added.)

The following exchange then took place between Gulf's counsel and the magistrate:

"MS. OXFORD: Your Honor, *I had asked her to compute the payment that Mr. Pryor would receive if he had stayed with B.F. Goodrich* or the B.F. Goodrich affiliated company, and I simply ask that that be admitted.

"THE COURT: I've already overruled it, Ms. Oxford. Don't argue with the Court.

"MS. OXFORD: Very well, Your Honor. I'm just a little confused exactly how I'm going to prove—

"THE COURT: You're trying to prove damages and *I've told you the damage issue is not going to the jury.*

" . . . .

"MS. OXFORD: The purpose for which I have asked that this testimony be ad-mitted is to show *that Mr. Pryor has not lost anything, as he is claiming in this lawsuit,* that when he came to Gulf, every representation—

"THE COURT: *That's what the Court will decide later, depending upon the verdict of this jury —*

"MS. OXFORD: Very well, Your Honor—

"THE COURT: Then you can prove it to the Court. You can prove it by this witness or other witnesses.

"MS. OXFORD: Very well, Your Honor. The sole reason I would ask for this testimony is to—

"THE COURT: *This is not a matter for the jury. This is a matter the Court is going to take care of, depending upon the verdict of the jury."* (Emphasis added.)

All the foregoing exchanges and rulings took place in the presence of the jury.

While we do not doubt the power of a trial court to order a separate trial on its own motion or, in its discretion, to separately try the damage issues in a case such as this, the present record nevertheless illustrates the unfortunate confusion which can occur when the above-quoted admonition of *Response of Carolina, Inc.* is not fully heeded.

### III.

As stated earlier, the contention Pryor seemingly advanced at trial was that he and Gulf entered into an agreement whereby he was entitled to receive (either from the Gulf Plan alone or from a combination of payments from the Gulf Plan and Gulf itself) an amount equal to what an employee credited with *thirty-five years and ten months of benefit service would receive under the Gulf Plan,* less what Pryor was actually receiving under the B.F. Goodrich Plan. On the other hand, Gulf contended that no valid and enforceable agreement respecting pension benefits existed, but that if one did, its terms were that Pryor would not lose any pension benefits by transferring to Gulf; in other words,

that Pryor would still get his B.F. Goodrich Plan pension for his years of benefit service under the B.F. Goodrich Plan, *or* that the benefits Pryor would eventually receive upon retirement under the B.F. Goodrich and the Gulf Plans would not be less than the benefits he would have received had he continued to work for B.F. Goodrich and received benefits *under the B.F. Goodrich Plan for thirty-five years and ten months of service.*[15]

It is apparent to us, on consideration of the entire record, that all concerned, counsel, court, and jury, were confused as to just what issues were to be determined, by whom or at what stage of the proceedings.

This confusion is reflected in the contrast between Pryor's complaint, which proceeded on a theory that he should receive from all sources not less than what would be received by an employee with some thirty-five years of service *under the B.F. Goodrich Plan,* and the claim he apparently sought to advance at trial, namely, that he should receive from all sources what would be received by an employee with some thirty-five years of service *under the Gulf Plan.* Pryor's evidence itself tends to blur this distinction, as much of it focuses on whether by transferring he would forfeit his benefits under the B.F. Goodrich Plan, or would "continue" to get his benefits, or would "lose" anything in respect to pension benefits by transferring. Confusion on the part of the magistrate is apparent in his ruling that evidence showing Pryor had lost no pension benefits by transferring to Gulf, and that what Pryor would receive under the B.F. Goodrich Plan and the Gulf Plan in combination exceeded what he would have

received under the B.F. Goodrich Plan had he remained under it until his retirement, was relevant only to the issue of damages. Such evidence would be relevant to whether Gulf *breached* its agreement with Pryor, if the agreement were that he would not lose his B.F. Goodrich Plan benefits or would not receive less under the B.F. Goodrich Plan and the Gulf Plan combined than he would have received had he remained under the B.F. Goodrich Plan. Likewise, the magistrate's statements that he would submit to the jury "only the issue of whether or not he had a contract," and his sustaining of Pryor's counsel's objection, which argued that the only issue was "whether there was a contract or whether there was not," indicates that all the jury would decide was the existence of a contract respecting pension benefits, not its terms or breach. On the other hand, the magistrate's statements that the damages would not be submitted to the jury might be taken to mean that everything else would be. Since all this transpired in the presence of the jury, it, too, may have been confused as to just what the issues were.[16]

With respect to the asserted agreement, the magistrate charged the jury as follows:

"Plaintiff . . . alleges that he was concerned [about] the terms of the transfer and delayed accepting the new job *until he was given assurance that all employee benefits that he had previously enjoyed would not be adversely affected by the move. He contends that he was given this assurance* by several high-ranking executives and agents of the Goodrich-Gulf Chemicals, Inc. [really those of

---

**15.** It is undisputed that Pryor received credit from Gulf for *time* service back to 1942, and that he therefore lost none of the benefits, such as seniority, vacation, sick leave, insurance, and the like, which were based on *time* service.

**16.** The magistrate's confusion is further reflected by his admission of the testimony of Mrs. Davis as to what an employee (having Pryor's salary history) with thirty-five years and ten months of benefit service would receive under the B.F. Goodrich Plan, which he had excluded on the merits, at the damage hearing, for its consideration *at that time*

would only be consistent with *no* determination having been made that the Gulf-Pryor agreement was that Pryor would receive from all sources not less than an employee with the same thirty-five years of service would receive *under the Gulf Plan.* And the magistrate's confusion is finally reflected in his judgment, which awarded Pryor benefits from Gulf equal to what an employee with thirty-five years and ten months of service would receive under the Gulf Plan, *without any deduction or credit for what Pryor was actually receiving and to receive under the B.F. Goodrich Plan.*

Gulf's Spencer Chemical Division] which assured him *that his pension plan and his pension benefits,* and other employee benefits, *would continue* uninterrupted by each succeeding corporation or entity. . . .

"You are instructed that you may find for the Plaintiff in this case if you believe from a preponderance of the evidence that the Defendant, Gulf Oil Corporation, or any of its agents or representatives, made oral and/or written representations to the Plaintiff, Bodie C. Pryor, that if he elected to continue [*sic*] his employment with Gulf Oil Corporation in [1965] that he would be given full credit for years of 'benefit service' towards *his pension plan* upon normal retirement.

" . . . .

"The Defendant, Gulf Oil-Chemicals Division, denies that there were ever any promises made to the Plaintiff that he would have *a pension plan* payable upon his retirement that *would include all of his prior years of service* with B.F. Goodrich Chemical Company, and/or Goodrich-Gulf Chemical Company.

"The Defendant further alleges that the executives and agents of Goodrich-Gulf Chemicals, Inc., and Gulf Oil Corporation, *alluded to in Plaintiff's complaint,* did not have any authority to make the assurances or enter into *the agreement* with Plaintiff, *as alleged in Plaintiff's complaint.* It is Defendant's position that they have not violated their duty to Plaintiff by counting only 12 and $\frac{7}{12}$ths years of service for a determination of pension benefits, instead of 35 and $\frac{10}{12}$ths years of *combined* services.

"The Defendant further alleges that the Plaintiff had full knowledge of all the facts in any way connected with or related to his employee benefits, both before and after being employed by the Defendant, and *by accepting employment with Gulf Oil Corporation in 1965, he waived any rights he had with respect to his previous rights of employment,* particularly to his prior years of service *for pension purposes.* You are instructed that if you find, from a preponderance of

the evidence, as that term has heretofore been defined for you, that the Defendant, Gulf Oil Corporation, or any of its agents or representatives, did not make any oral or written representations to the Plaintiff, Bodie C. Pryor, that if he elected *to continue* his employment with the Defendants, that he would be given full credit for years of benefit service towards *his pension plan* upon retirement, then you should find for the defendant." (Emphasis added.)

Gulf contends that these instructions were insufficient, misleading, and confusing, and that they misrepresented its contentions to the jury. We agree.

■ The standard for review of a trial court's charge is as follows:

" '[T]he test is not whether the charge was faultless in every particular but *whether the jury was misled* in any way and whether it *had understanding of the issues and its duty to determine those issues.'* Our jurisprudence mandates that we consider the charge as a whole, viewing it in the light of the allegations of the complaint, the evidence, and the arguments of counsel." *Smith v. Borg-Warner Corp.,* 626 F.2d 384, 386 (5th Cir.1980) (citations omitted; emphasis added), *quoting Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1100 (5th Cir. 1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

It was necessary for the jury to find, at the least, not only whether there was an agreement respecting retirement benefits, but also what its terms were, whether merely that Pryor would not lose his B.F. Goodrich Plan benefits and would receive normal benefits under the Gulf Plan, or that what he would receive in total under the B.F. Goodrich Plan and under the Gulf Plan (or from Gulf) would not be less than what he would have received if he remained under the B.F. Goodrich Plan until retirement, or that he would receive from the Gulf Plan (and/or from Gulf) what an employee with Gulf service from 1942 would have received under the Gulf Plan less

whatever Pryor received under the B.F. Goodrich Plan. While the instructions may have presented the question of whether there was an agreement respecting retirement benefits, they otherwise were plainly inadequate.

In view of the inconsistency between Pryor's complaint and his theory at trial, the evidence presented at trial, the arguments of counsel, and the rulings and remarks of the magistrate in the presence of the jury, we hold that the instructions given were insufficient, misleading, and confusing, since they failed to plainly delineate what the jury was required to find in respect to the terms of the agreement and failed to make clear just what the claimed terms of the agreement were. The above-referenced instructions did not distinguish between the B.F. Goodrich Plan and the Gulf Plan as regards Pryor's years of benefit service, but only referred to "his" or "a pension plan." It was important that this distinction be made so that the jury, once they had found that an agreement existed, could determine its terms.

The entire thrust of the instructions is that the *only* issue was whether or not Pryor was assured by Gulf that he would receive pension benefits for all his years of service from 1942 to retirement (thirty-five years and ten months). Nothing in the instructions tells the jury they must determine whether the benefits so assured to Pryor would be his full benefits under the B.F. Goodrich Plan for the years 1942–1965, undiminished by reason of his transfer to Gulf, plus the normal benefits under the Gulf Plan for his years with Gulf from 1965 to retirement, *or* would be benefits under both Plans in a total amount not less than what Pryor would have been entitled to under the B.F. Goodrich Plan for service from 1942 to 1978, *or* would be benefits in an amount not less than what Pryor would have been entitled to under the Gulf Plan for service from 1942 to 1978. The jury was *not* required, in order to return a verdict for the plaintiff, to find that there was any breach by Gulf of the assurances given.

The charge *contrasts* (i) Pryor's claim that "he was given assurance [in 1965] that all employee benefits that he had previously enjoyed would not be adversely affected by the move" and "that he was given this assurance . . . that . . . his pension benefits . . . would continue," *with* (ii) Gulf's claim that it did not promise "Plaintiff that he would have a pension plan payable upon his retirement that would include all of his prior years of service with B.F. Goodrich Chemical Company, and/or Goodrich-Gulf Chemical Company" or "that he would be given full credit for years of 'benefit service' towards his pension plan" and that Pryor "by accepting employment with Gulf Oil Corporation in 1965, . . . waived any rights he had with respect to his previous rights of employment, particularly to his prior years of service for pension purposes." The jury is thus told to choose between versions (i) and (ii); to find for Pryor if they find version (i), and to find for Gulf if they find version (ii). Yet, a finding of version (i) is wholly consistent with a finding that Gulf assured Pryor that he would, on retirement, receive his full benefits under the B.F. Goodrich Plan for his 1942 to 1965 service, undiminished by reason of his transfer to Gulf, plus the normal benefits under the Gulf Plan for his years with Gulf, and that this would total not less than what he would be entitled to under the B.F. Goodrich Plan if he remained under that plan until his retirement, instead of transferring to Gulf, so he would lose nothing by the transfer; and the jury was never instructed otherwise.

Indeed, the plain inference from the instructions is that the jury was *required* to find for Pryor *even though* they believed that Pryor was only assured that his B.F. Goodrich Plan pension benefits "would not be adversely affected by the move" and "would continue" and that on retirement he would receive pension benefits from the Gulf Plan and the B.F. Goodrich Plan for all his years of service in a total amount not less than what he would have received under the B.F. Goodrich Plan had he remained with it until retirement instead of transferring to Gulf.

Moreover, the instructions misstate Gulf's contentions. Contrary to the express lan-

guage of the instructions, Gulf never contended that "by accepting employment with Gulf Oil Corporation in 1965, he [Pryor] waived any rights he had with respect to his previous rights of employment, particularly to his prior years of service for pension purposes." The only rights which Pryor had in 1965 before he came with Gulf in respect to prior years of service for pension purposes were his rights under the B.F. Goodrich Plan, and it was precisely Gulf's contention that Pryor did *not* waive any such rights "by accepting employment with Gulf Oil Corporation in 1965."

Further, the instructions also erroneously infer that it was Gulf's position that Pryor was not entitled to have pension benefits for thirty-five years and ten months of service, while, on the contrary, it was Gulf's position that Pryor was entitled to pension benefits for thirty-five years and ten months of service, and was receiving such benefits, in the form of benefits respecting twenty-three years and three months from the B.F. Goodrich Plan and benefits respecting twelve years and seven months of service from the Gulf Plan.[17]

As stated by Professor Wright:

"It is the inescapable duty of the trial judge to instruct the jurors, fully and correctly, on the applicable law of the case, and to guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved in their search for truth. The court must instruct the jury properly on the controlling issues in the case even though there has been no request for an instruction or the instruction requested is defective.... It must not give instructions, however, that are confusing or misleading." 9 Wright & Miller, *Federal Practice and Procedure: Civil* § 2556 (1971).

The charge here was insufficient under this standard. It failed to adequately "guide, direct, and assist" the jury "toward an intelligent understanding of the ... factual issues involved," and did not "instruct the jury properly on the controlling issues in the case." In the above-quoted words of *Smith v. Borg-Warner, supra,* the jury "was misled" by the charge and the charge did not furnish the jury an "understanding of the issues and its duty to determine those issues." 626 F.2d at 386.

■ While we have some concern about the sufficiency of Gulf's objections,[18] we conclude that they were adequate to have called the trial court's attention to the de-

---

**17.** We also note that the last paragraph of the instructions quoted in the text erroneously placed the burden of proof on Gulf.

**18.** Gulf's objections included the following:

"MS. OXFORD: And secondly, I'd object to that paragraph on the basis that it does not make clear to the Jury that they are to be looking at the Gulf pension plan only, and not the combination of B.F. Goodrich and Gulf's plan. That—in other words, where it says, 'he would be given full credit for years of benefit service toward his pension plan upon normal retirement.'

"I think the evidence shows that he has been given credit, his years of service, under a pension plan. They are just complaining about the Gulf plan only. That's not clear, that the Jury can consider the B.F. Goodrich plan.

"....

"MS. OXFORD: Your Honor, on page 12, the first full paragraph, beginning with, 'The Defendant, Gulf Oil-Chemicals Division, denies that there were ever any promises made to the Plaintiff that he would have a pension plan payable upon his retirement that would include all of his prior years of service with B.F. Goodrich Chemical Company, and/or Goodrich-Gulf Chemical Company.'

"Now, Your Honor, Gulf Oil Corporation has always contended that the Plaintiff does have a pension plan, or did have a pension plan, payable upon his retirement for those years of service, but that another company is responsible for that plan, and is, in fact, paying that money.

"....

"MS. OXFORD: Continuing that same sentence, suggesting that Gulf contends by accepting employment with Gulf Oil Corporation in 1965, he waived any rights he had with respect to his previous rights of employment, particularly to his prior years of service for pension benefits.

"Your Honor, we object to that, because it implies we're trying to deny him his Goodrich-Gulf benefits, which he is, indeed, getting, and we certainly are not trying to take that away from him, or imply that he waived his right to his benefits under the Goodrich-Gulf benefit plan."

These objections were all overruled.

fects in question. Although the record contains no proposed instructions submitted by Gulf, we believe that this is not fatal to Gulf's position. Requested instructions are not necessary to preserve error in failing to instruct on the controlling issues or in giving erroneous or misleading instructions. *See* Wright & Miller, *supra,* § 2556; *Turner Construction Company v. Houlihan,* 240 F.2d 435, 439 (1st Cir.1957).[19] Indeed, we have reversed for misleading charges in civil cases where no objection whatever was made to the charge. *See, e.g., Jamison Co., Inc. v. Westvaco Corp.,* 526 F.2d 922, 932–33 (5th Cir.), *reh'g denied,* 530 F.2d 34 (5th Cir.1976).

Finally, the verdict form here was a totally general one, as the jury was merely to "find for the Plaintiff" or "find for the Defendant." In the light of the evidence, and the insufficient, confusing, and misleading nature of the charge, it is impossible to tell from the verdict whether the jury found that Gulf's assurance to Pryor was (i) that by transferring to Gulf he would have on his retirement his full benefits under the B.F. Goodrich Plan in respect to his 1942–1965 service, undiminished by the transfer, plus the normal benefits under the Gulf Plan for his years with Gulf from 1965 to retirement, *or* (ii) that when he retired from Gulf, Pryor would have retirement benefits, under the B.F. Goodrich Plan and under the Gulf Plan (and/or from Gulf) which would be in a combined total amount of not less than what he would have received had he stayed with the B.F. Goodrich Plan until his retirement, *or* (iii) that when he retired from Gulf, Pryor would have retirement benefits, under the B.F. Goodrich Plan and under the Gulf Plan (and/or from Gulf) which would be in a combined total amount of not less than what he would have received had he been under the Gulf Plan from 1942 until his retirement. Nor was the jury required, in order to return a verdict for Pryor, to find that Gulf breached any assurance. The verdict, therefore, not only provides no basis for a judgment such as that rendered by the

magistrate, which gave Gulf no credit for what Pryor received and would receive under the B.F. Goodrich Plan, but likewise affords no basis for a judgment for Pryor on the theory that Gulf assured him that on retirement he would receive, from all sources, a pension at least as great as if he had been under the Gulf Plan since 1942.

Because of the insufficient, confusing, and misleading charge, and the ambiguous jury verdict it produced, the judgment for Pryor cannot stand. The case must therefore be reversed and remanded for a new trial.

REVERSED AND REMANDED.

THORNBERRY, Circuit Judge, specially concurring:

I concur in Judge Garwood's excellent opinion, with the understanding that all we are deciding today is that the instructions given the jury were insufficient, confusing, and misleading, and require reversal of the judgment below and remand for a new trial.

---

**19.** *Houlihan* states: ". . . if the court fails fully to charge on the principal issues involved, or charges thereon erroneously, an objection taken . . . will preserve the objecting party's rights." 240 F.2d at 439.