Edward N. PHILLIPS,
Plaintiff-Appellant,

v.

Alvis VANDYGRIFF, et al.,
Defendants-Appellees.

No. 81–1552.

United States Court of Appeals,
Fifth Circuit.

Aug. 15, 1983.

---

Jack N. Price, Austin, Tex., for plaintiff-appellant.

John Guittard, Dallas, Tex., for First Sav. and Loan Ass'n of Bowie.

Barry K. Bishop, David C. Duggins, Austin, Tex., for First Federal Sav. & Loan Ass'n of Luling.

T.P. Flahive, Austin, Tex., for Paris Sav. & Loan.

Walter H. Mizell, Michael G. Mullen, Austin, Tex., for Mainland Sav.

J. David Griffin, W. Ted Minick, Dallas, Tex., for Exchange Sav. and Loan Ass'n.

C.C. Small, Jr., Austin, Tex., for North Texas Sav. & Loan Ass'n.

James Vincent Sylvester, Yolanda Martin McKeeman, Asst. Attys. Gen., Austin, Tex., for Vandygriff, et al.

Before BROWN, GOLDBERG and HIGGINBOTHAM, Circuit Judges.

GOLDBERG, Circuit Judge:

In this case we are called upon to review the consequences of an industry custom amounting to a de facto licensing of prospective managerial employees of state chartered savings and loan associations by the state savings and loan commissioner. We find that such de facto licensing implicates liberty interests under the fourteenth amendment and might create pendent state tort claims. It does not, however, amount to a per se of antitrust violation. Accordingly, we reverse in part and remand for further proceedings.

## I. INTRODUCTION

### A. Facts

Phillips, plaintiff-appellant, worked periodically in the savings and loan industry from 1968 until 1977. In 1977 an unrelated business venture proved to be unsuccessful and Phillips attempted to reenter the savings and loan industry. Beginning in early 1977, Phillips entered into talks with agents and principals of the Sinton Savings and Loan Association for a position as managing officer, and apparently an agreement in principal was reached between Phillips and Sinton. During this period Phillips and some of the Sinton principals met with defendant Vandygriff, Commissioner of the Texas Savings and Loan Department ("the Department"). Phillips never actually began work at Sinton, because of what the Sinton principals told Phillips were "internal auditing" problems. Phillips repeatedly contacted Vandygriff in an effort to find out the nature of Sinton's problems, but Vandygriff would not divulge that information to Phillips because Phillips was not formally associated with Sinton. Vandygriff did give Phillips the "fatherly advice," Record at 323, that Phillips remove himself from the "whole mess." Record at 76. Phillips apparently took this advice and advised Sinton to contact him if the problems were ever resolved.

These "internal auditing" problems in fact turned out to be severe irregularities including misuse of funds and issuance of commitments that could not be funded. As a consequence of these irregularities, two officers of Sinton were indicted in October 1978. When Phillips heard of the indictments, in an abundance of caution he volun-

tarily contacted the FBI to see if they were interested in him as well. He not only was not indicted, he was never even interviewed.

Phillips attempted to find other employment in the industry with several other savings and loans.[1] These attempts were unsuccessful, Phillips claims, because of a custom in the industry of screening prospective managerial employees with Vandygriff. Vandygriff was disturbed by Phillips' proximity to the Sinton derelictions. Though Vandygriff did not actually suspect Phillips of wrongdoing, Vandygriff was unsure enough of the facts surrounding Phillips' involvement with Sinton that he withheld his recommendation. When prospective employers contacted Vandygriff about employing Phillips, Vandygriff told them two things. First, Vandygriff told them some version of the facts surrounding Phillips connection with Sinton. Second, Vandygriff told them he could not recommend Phillips for employment. Because of the industry custom, this withholding of a recommendation was enough to exclude Phillips from the industry.[2]

### B. Procedure Below

On January 11, 1980, Phillips filed a complaint against the Texas Savings and Loan Department, Commissioner Vandygriff, former Deputy Commissioner Wright, and the seven savings and loan associations, see supra note 1. Phillips alleged five causes of action against the various defendants. First, Phillips claimed that the custom in the industry and Vandygriff's action constituted a group boycott, in per se violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1976). Second, Phillips claimed that he was libeled and slandered. Third, Phillips alleged that the defendants' actions constituted wrongful interference with contracts or prospective contractual relationships. Fourth, Phillips argued that the defendants

conspired to interfere with his livelihood. Fifth, Phillips claimed that the defendants deprived him of his constitutional rights in violation of 42 U.S.C. § 1983 (1976). Phillips pursued all of the defendants under all of the claims, either for direct actions or for conspiracy.

Before trial each savings and loan association moved for summary judgment; the state defendants moved for partial summary judgment only with respect to the antitrust claim. The district court orally granted summary judgment on behalf of all savings and loan associations except Paris. At the close of plaintiff's and defendants' cases the remaining defendants—Vandygriff, Wright, the Department,. and Paris—moved for directed verdict. Their motion for directed verdict was granted solely with respect to the antitrust claim.

The remaining claims against the remaining defendants went to the jury. The jury found for Wright and Paris, but found against the Department and Vandygriff on the section 1983 claim. Phillips was awarded $35,000 each against Vandygriff and the Department. In connection with the slander and libel claim, the jury found that the information conveyed to the savings and loan associations was true.

After trial all parties moved for judgment. The Department was granted judgment based on its eleventh amendment immunity. The court granted Vandygriff judgment on the civil rights claim because of the jury finding in the slander and libel claim that the information conveyed was true, relying on *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam). All defendants received judgment on the remaining claims based on the jury verdict. Phillips now appeals.

### C. Issues on Appeal

Phillips does not appeal the verdict on defamation or the judgments in favor of

---

1. The other savings and loans were defendants Paris Savings and Loan Association, First Savings of Bowie, Exchange Savings and Loan Association, Mainland Savings and Loan Association, North Texas Savings and Loan Association, First Federal Savings and Loan Associa-

tion of Luling, and Aztec Savings and Loan Association.

2. These facts as presented were disputed. Phillips, however, won a jury verdict on his claim, see infra Part II.C, so we are presenting the facts in a light favorable to his claim.

Wright, Aztec,[3] or the Department. Phillips, however, does appeal virtually everything else. First, he claims that his section 1983 cause of action is the procedural due process/licensing sort, not the *Codd v. Velger* sort. Thus, the trial court should not have granted Vandygriff judgment based upon *Codd.* Second, Phillips argues that by granting summary judgment to the savings and loan associations, the trial court deprived Phillips of a chance to place his per se antitrust claim before the jury. Finally, Phillips urges that the dismissal of the savings and loan associations deprived him of his section 1983 conspiracy claim and pendent state claims. We shall address these arguments in turn.[4]

## II. DE FACTO LICENSING AND SECTION 1983

■ Our review of Phillips' section 1983 claim is hampered by the fact that the defendants, plaintiff, and trial judge all held different theories of the cause of action. The defendants thought the claim was of the "stigma-plus" variety. *See Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam). The plaintiff thought the claim was one of de facto licensing without due process. The trial court viewed the case as a·hybrid when he sent it to the jury; after the jury returned a verdict, the trial court became persuaded by the defendants and entered a judgment in their favor. We shall investigate each of these views.

### A. Defending Against Stigma-Plus

The defendants viewed this claim as one concerning a public official who communicated true facts about a person, which resulted in that person being unable to acquire employment. This characterization places Phillips' claim squarely within the ambit of a long line of Supreme Court cases

dealing with reputation. If the facts communicated were true, however, these same Supreme Court cases protect the defendants.

■ The two elements of a section 1983 claim are (1) deprivation of a federal right (2) under color of state law. 42 U.S.C. § 1983 (1976). Under the fourteenth amendment, people may not be deprived of life, liberty, or property by the states without due process of law. A section 1983 claim resting on the fourteenth amendment must first identify a protected life, liberty, or property interest.

*Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), established the principle that government-imposed stigma that closes job opportunities is actionable under section 1983. In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the plaintiff claimed his reputation had been injured by distribution of a flyer wrongly listing him as a known shoplifter. The Supreme Court then made clear the idea that reputation alone is not a protected liberty interest—a plaintiff must show stigma *plus* an infringement of some other interest. *See generally Marrero v. City of Hialeah,* 625 F.2d 499, 512–20 (5th Cir.1980) (stigma plus injury to business goodwill protected under state law states interest under section 1983). Finally, in *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam), the Court highlighted the fact that the plaintiff must prove that the stigma was caused by a *false* communication. In the case at bar, the defendants' basic defense was that although Vandygriff might have stigmatized Phillips, resulting in a loss of employment opportunities, Vandygriff never communicated anything that was false about Phillips.

### B. Complaining about De Facto Licensing

Throughout the case, Phillips presented a very different view of his section 1983 claim

---

**3.** Aztec was a newly chartered savings and loan association, and Texas law explicitly grants the Commissioner the power to approve managing officers of newly chartered institutions. Tex.Civ.Stat.Ann. art. 852a § 2.01a

(Vernon Supp.1982). Thus, Phillips does not appeal the judgment for Aztec.

**4.** For a synopsis of the issues presented, the trial court's disposition, and our disposition on appeal, see *infra* note 13.

from that of the defendants. Phillips' claim was that an industry custom had arisen, resulting in Vandygriff's having de facto licensing power over employment as a manager of a savings and loan in Texas. No savings and loan would employ anyone in a managerial position without Vandygriff's approval. Assuming this version of the facts, we shall now explore whether this claim is colorable as a matter of law under section 1983.

■ *1. Liberty Interest.*—The first question is whether pursuing employment as a manager of a savings and loan is a liberty interest. "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [fourteenth] Amendment to secure." *Truax v. Raich,* 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915). *See also Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) ("Without doubt, ['liberty' in the fourteenth amendment] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life . . . ."); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 238–39, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957) ("A state cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.") (footnote omitted); *Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959) ("[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment . . . ."); *Board of Regents v. Roth,* 408 U.S. 564, 573–74, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) (respondent denied relief because "[t]he State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would be a different case.") This Circuit has also repeatedly acknowledged the principle that a person has a liberty interest in pursuing an occupation. *See, e.g., Ferrel v. Dallas Independent School District,* 392 F.2d 697, 707 (5th Cir. 1968); *Shaw v. Hospital Authority,* 507 F.2d 625, 628 (5th Cir.1975); *Daly v. Sprague,* 675 F.2d 716, 727 (5th Cir.1982).

Phillips has claimed that he was excluded from work within Texas as a manager of a savings and loan association. Under these Supreme Court and Fifth Circuit cases, it is clear that Phillips' interest in that occupation is a liberty interest within the ambit of the fourteenth amendment.

■ *2. Deprivation Without Due Process.*—The second question regarding Phillips' claim is whether he was deprived of his liberty interest in occupation as a manager of a savings and loan association without due process of law. It is axiomatic that not all deprivations of protected interests are actionable; only deprivations without due process are actionable. *See, e.g., Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The question before us now is whether deprivation through de facto licensing, through an industry custom of screening prospective managerial employees with the state commissioner, is an actionable deprivation.

The cases cited in the previous section establish a spectrum of deprivations that aids our review of the practice in question in this case. The spectrum ranges from deprivation of liberty to pursue an occupation caused by actions specifically intended to have that effect, to deprivations that occur as a collateral consequence of other legitimate acts. At the "innocuous" end of the spectrum, excluding a person from an occupation by making true statements is not actionable. *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam). Thus, had Vandygriff merely passed on true information about Phillips, Phillips would have no cause of action. Conversely, excluding a person from an occupation by making false defamatory statements is actionable. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

At the other extreme of the spectrum, excluding a person from an occupation by

denying that person a license for practicing that occupation is clearly actionable. *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). Similarly, denying a person collateral credentials or privileges practically necessary for pursuing an occupation is also actionable. *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (denial of security clearance practically necessary for employment as defense contractor); *Sosa v. Board of Managers of Val Verde Memorial Hospital,* 437 F.2d 173 (5th Cir.1971) (exclusion of physician from hospital staff privileges). Of course, these "actionable" deprivations are actionable only when made "in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment." *Schware, supra,* 353 U.S. at 238–39, 77 S.Ct. at 756.

We are persuaded that de facto licensing is a deprivation of the sort that may permissibly be accomplished only in the right manner and for the right reasons. First, this is precisely the sort of deprivation that would benefit from procedural protections, such as notice of reasons and an opportunity to be heard.

> That a conclusion satisfies one's private conscience does not attest its reliability. The validity and moral authority of a conclusion largely depends on the mode by which it was reached. Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done.

*Anti-Fascist Committee v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

The continuing validity of Justice Frankfurter's observations is well demonstrated by the facts of this case. Phillips was excluded from his chosen profession not by Vandygriff's knowledge of any unfitness on Phillips' part, but by Vandygriff's private determination of guilt by association.

Second, we find the difference between formal licensing and de facto licensing to be unimportant. If a Texas statute required that savings and loan managerial officers be screened by the Commissioner, and the Commissioner denied entry into the profession without notice or an opportunity to be heard, such a procedure clearly would be actionable. In this case we have the same basic procedure and result, but authorized solely by the assumption of power through industry custom. The absence of statutory authority for licensing cannot somehow lessen the demands of due process.

In short, we conclude that Phillips' theory of the events before us states a cause of action under the fourteenth amendment. The freedom to pursue any of the "common occupations" has long been held to be a liberty interest. Loss of that liberty interest through a custom of de facto licensing is a deprivation actionable under the fourteenth amendment. Finally, no party to this lawsuit has contended that the procedural protections of the fourteenth amendment, minimally notice and an opportunity to be heard,[5] were provided here.

### C. Trial of a Hybrid

We now have before us two legal theories of actions cognizable under section 1983. The first, the defendant's view, follows the "stigma-plus" mold. Under this theory, Phillips must prove that his opportunity to work as a managing officer of a savings and loan was foreclosed by false and defamatory statements by Vandygriff. The second, Phillips' view, is that this is a de facto licensing case. Phillips was excluded from the occupation of his choice by an

---

**5.** We do not suggest that the full panoply of fourteenth amendment procedural protections, such as representation by counsel and confrontation and cross examination of opposing witnesses, is required here. *See, e.g., Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct.

1148, 1157, 71 L.Ed.2d 265 (1982); *Mathews v. Eldridge,* 424 U.S. 319, 334–335, 96 S.Ct. 893, 902–903, 47 L.Ed.2d 18 (1976); *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

industry-wide custom of screening prospective employees with Vandygriff. Being presented with conflicting views of the case, the trial judge fashioned a jury charge that combined elements of both theories.

The jury was correctly informed of Phillips' position:

> In this case, Phillips claims that there exists in the savings and loan industry in the State of Texas a custom by which prospective management employees are screened by the State of Texas Savings and Loan Department and that their employment is contingent on the approval of the Commissioner and Deputy Commissioner in the Department. Phillips claims that he was entitled to be free from the custom of having his qualifications screened by the Department and from having the Commissioner's opinion of his qualifications communicated to potential employers without his having notice of such communication or an opportunity to confront those persons who formed the opinion and to rebut any conclusions they [sic] may have been drawn about him before such conclusions were communicated to potential employers.

Record at 854. This charge, standing alone, quite clearly communicates the substance of Phillips' de facto licensing claim.

Unfortunately, this part of the charge did not stand alone. Phillips' de facto licensing claim was consistently spiced with a stigma-plus element. The jury was told that "[t]he 'liberty interest' which Phillips is claiming he lost is (1) the right to engage in or pursue a lawful occupation in the savings and loan industry, and (2) a loss of his good

reputation as a result of defamation by a public official." Record at 853. Later, the charge referred to "Phillips' interest in his reputation and his interest in pursuing the occupation of his choice." Record at 854. Finally, the key interrogatory put to the jury was: "Do you find that Vandygriff's communications were a cause in fact of Phillips' loss of reputation and inability to be employed in the savings and loan industry?" Record at 855. The jury answered this question "Yes." Id.[6]

After trial, the trial judge became convinced that *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam), required that Phillips plead and prove the falsity of Vandygriff's statements to recover under section 1983. *See* Memorandum Opinion and Order, Record at 949. The only definition of "defamatory" the jury received did not require that the communication be false. Record at 861. In an interrogatory relating to a pendant state defamation claim, however, the jury found that those communications were true. Record at 562.[7] Accordingly, the trial judge entered judgment in favor of Vandygriff.

This ruling was correct under a "stigma-plus" section 1983 claim. However, as we have discussed at length, Phillips also put forth a valid de facto licensing section 1983 claim. The trial judge's grant of judgment for Vandygriff notwithstanding the verdict does not pay proper respect to Phillips' de facto licensing claim, so we must reverse the JNOV. Though Phillips might argue that having prevailed on the blended charge, he has earned a judgment on his claim, we cannot agree.[8]

---

**6.** Phillips explicitly objected to the mixture of the two theories in the jury charge:

> The issues inquiring about whether or not the Defendants' [sic] acted under color of state law, et cetera, with respect to civil rights violations inquires whether or not the Defendants communicated information about Mr. Phillips to various savings and loan offices. We suggest it properly should be phrased as to whether or not the Defendants either directly refused to approve Phillips for positions with the various savings and loan associations or that they took actions which caused a refusal. That is the direct issue rather than the general inquiry of communicating information.

Transcript at 917.

**7.** There was much dispute as to whether or not the interrogatory regarding truth applied to the same statements at issue in the section 1983 claim. The trial judge decided that the interrogatory did not apply to the same statements, but that the substance of the two sets of communications were the same. This dispute is not relevant to our disposition of the case, so we do not pass on it.

**8.** The argument is that by reaching a verdict based upon "Phillips' loss of reputation and inability to be employed in the savings and loan industry," Record at 855, the jury necessarily

"[T]he test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues." Our jurisprudence mandates that we consider the charge as a whole, viewing it in the light of the allegations of the complaint, the evidence, and the arguments of counsel.

*Smith v. Borg-Warner Corp.*, 626 F.2d 384, 386 (5th Cir.1980) (quoting *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1100 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)). *See also Pryor v. Gulf Oil Corp.*, 704 F.2d 1364 (5th Cir.1983). Viewing the charge as a whole, and considering particularly the different theory argued by Vandygriff and accepted by the district court, it is not clear to us that the jury was clearly informed as to the nature of the de facto licensing claim. Accordingly, we remand for new trial on that claim.[9]

### D. The Private Conspirators

Phillips pursued his section 1983 claim against the savings and loan associations as well as the state officers. His First Amended Complaint specifically mentions "[t]he actions of the Defendants in carrying out and combining to carry out established policy and practice of a state regulatory agency." Record at 178. Because all of the savings and loan associations except Paris were granted summary judgment, no issues on their section 1983 liability were presented to the jury.[10] We shall first examine the savings and loan associations that were granted summary judgment, and then consider Paris, which went to trial.

*1. The Summary S & Ls.*—To be liable under section 1983, a defendant must have acted under color of state law. Private parties, however, can be liable under section 1983 if they have conspired with a state official. "The involvement of a state official in such a conspiracy plainly provides the state action essential" to a section 1983 claim. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). Thus, there is no inherent legal obstacle to pursuing the savings and loan associations under section 1983.

To establish a conspiracy between the savings and loan associations and Vandygriff, "[i]t is enough that [a private party]

---

found facts supporting a de facto licensing claim.

**9.** Vandygriff raises a formalistic argument that he was not named in his individual capacity in the pleadings and that in his official capacity he gains eleventh amendment immunity. Fed. R.Civ.P. 9(a) states:

It is not necessary to aver the capacity of a party to sue or be sued ... except to the extent required to show the jurisdiction of the court. When a party desires to raise an issue as to ... the capacity of any party to sue or be sued ..., he shall do so by specific negative averment ....

Merely alleging eleventh amendment immunity, as Vandygriff did in his motion under Fed.R. Civ.P. 12(b)(6), is not a "specific negative averment" to raise the issue of the capacity in which Vandygriff was sued. Surely, had Vandygriff raised specifically the formalistic objection to his capacity, Phillips would have made the equally formalistic response of amending his pleadings to include the phrase "in his individual capacity."

**10.** First Federal Savings and Loan Association of Luling argues that it should be treated differently from the other savings and loan associa-

tions. All of the associations presented motions for summary judgment and the trial judge orally indicated he would grant all of the motions save that of Paris. *See* Minute Entry of September 10, 1981. Of course, to be effective the judgment must be evidenced by a written document entered in the record. Fed.R.Civ.P. 79(a). Apparently through inadvertance, no such document was entered with respect to Luling, and Luling was not formally granted judgment until the final judgment in favor of all defendants.

Luling presents the unusual argument that it was not dismissed from the case when it went to trial. Thus, Luling says, Phillips waived all jury issues with respect to its liability. We cannot accept this position. First, all parties tried the case based upon the trial judge's statement that he would grant summary judgment to Luling. We will not now allow Luling to take advantage of the ministerial oversight. Second, Rule 79(a) says nothing regarding timing of the formal entry of judgment. At the time the trial court entered final judgment for Luling, the only motion for judgment on behalf of Luling was its motion for summary judgment. Accordingly, we construe the entered judgment as a belated formal entry of the summary judgment orally granted to Luling.

is a willful participant in joint activity with the State or its agents." *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966). *See also Adickes, supra; Earnest v. Lowentritt,* 690 F.2d 1198, 1200 (5th Cir.1982). Here the objectionable activity was the industry custom of de facto licensing without procedural protections. Thus, to establish his section 1983 claim against the savings and loan associations, Phillips must show that the associations were willful participants in the industry custom of de facto licensing.

In order for the district court's grant of summary judgment to stand, there must be no genuine issue as to any material fact and the savings and loan associations must be entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Our review of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits before the court when it passed on the motion for summary judgment convinces us that the parties did dispute material facts. There appears to be a genuine issue as to whether the savings and loan associations were willful participants in the custom. The record, with disputed issues viewed favorably toward Phillips, shows the existence of the custom, and shows that each association contacted the Department regarding Phillips and subsequently refused further consideration of him. *See, e.g.,* Record at 101 (Mainland); *id.* at 360 (Luling); *id.* at 546 (Bowie); *id.* at 572 (North Texas); *id.* at 625 (Exchange). Accordingly, we reverse the summary judgments in favor of the savings and loan associations on the section 1983 claim.

■ *2. Paris at Trial.*—Paris is in a different situation because it actually went to trial on the section 1983 claim. The jury was charged that "Phillips also claims that Paris Savings and Loan acted under color of state law or custom to deprive him of his civil rights by agreeing with state officials Vandygriff or Wright to keep him out of the savings and loan industry." Record at 857. When asked "Do you find that Paris Savings and Loan acted under color of state law to deprive Phillips of his liberty interest?", the jury responded "No." *Id.* In the face of the jury finding that Paris did not agree to act with Vandygriff, we affirm the judgment in favor of Paris on the section 1983 claim.

*E. Conclusion on Section 1983*

In view of the continual confusion among the parties and the trial court as to the precise nature of Phillips' section 1983 claim, we pause a moment to wrap up what we are—and are *not*—saying about section 1983. Vandygriff apparently told two things about Phillips to the savings and loan associations that were considering hiring Phillips. First, Vandygriff told them that Phillips had been in some undefined way connected with the "Sinton affair." Second, he told them that he would not approve Phillips for employment in the industry. These two different types of statements have very different kinds of legal consequences.

The savings and loan industry is clearly one in which the public places great trust and confidence. It is imperative that the managerial officers of savings and loan associations be of the highest character, and an association that hired a managing officer without investigating his or her character would certainly be remiss. The Commissioner of the Texas Savings and Loan Department is obviously a valuable resource for an association inquiring about a prospective employee, and, indeed, we applaud that aspect of the practice.

Had Commissioner Vandygriff limited himself merely to truthfully reporting the information he had pertinent to Phillips, this would have been a very different case. Neither section 1983 nor any other law with which we are acquainted would penalize that truthful imparting of information necessary for the public welfare. But that most emphatically is *not* the essence of Phillips' section 1983 claim.

The practice of which Phillips complains under section 1983 is the custom giving the Commissioner de facto licensing authority over prospective managing officers of savings and loan associations. This is a difference that makes a difference. In a society based upon democracy, open public decision-

making, and *laissez-faire,* the practice of secret, de facto licensing is as insidious a dysfunction as one can imagine. *Laissez-faire* rests on a premise of formal economic equality. Key to this economic equality is the principle that all are free to pursue all legitimate forms of economic endeavor.[11] Procedural due process embodies an equally important political principle: government intrusions on private rights must be accomplished through procedures that will promote accurate and fair decisions.

At one foul, fell swoop, the custom of de facto licensing makes a mockery of both of these lodestar principles. Through secret proceedings Phillips was denied an opportunity to practice his chosen profession. The basis of this denial apparently was nothing more than a suspicion of a possibility of impropriety. This is precisely the kind of arbitrary decisionmaking infringing an important private right that the due process clause was designed to prevent. At a minimum, the fourteenth amendment demands that such an infringement of private liberty be preceded by notice of the basis of the charges and an opportunity to respond. Because Phillips was denied these most basic protections, section 1983 provides redress.

## III. ANTITRUST CLAIM

Phillips also claims that this same set of facts supports an action for a per se violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1976). Phillips argues that the savings and loan associations' collective refusal to hire him without Vandygriff's approval is nothing less than a boycott in per se violation of the antitrust laws. When the trial court granted summary judgments in favor of all the associations save Paris, those judgments included judgments on the antitrust claim. Without those associations in the trial, no antitrust case remained to go to the jury.

Given this procedural background, we shall treat the entire antitrust claim as if it had been resolved on summary judgment. Accordingly, we view the facts favorably

towards Phillips and assume that there was an agreement among savings and loan associations in Texas not to hire anyone as a managing officer without Vandygriff's approval. The question before us is whether that set of facts can support an antitrust claim.

### A. Per Se Boycotts, Generally

In this Circuit the law concerning per se boycotts is summarized in *E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178 (5th Cir.1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973), and *United States v. Realty Multi-List, Inc.,* 629 F.2d 1351 (1980). In *E.A. McQuade,* Judge Thornberry summarized the principles as follows:

Cases applying *per se* illegality to collective refusals to deal fall into roughly three categories. The first group, exemplified by *Eastern States Retail Lumber Dealers Assoc. v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914), have involved horizontal combinations among traders at one level of distribution, whose purpose was to exclude direct competitors from the market. Thus, in *Eastern States,* a combination of retail lumber dealers black-listed lumber wholesalers who sold directly to the retailers' customers. The obvious purpose of the combination—eliminating competition from the wholesalers—placed it "within the prohibited class of undue and unreasonable restraints." 234 U.S. at 612, 34 S.Ct. at 954.

*Klor's, Inc. v. Broadway-Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), illustrates a second category of group boycott cases, involving vertical combinations among traders at different marketing levels, designed to exclude from the market direct competitors of some members of the combination. For example, in *Klor's,* a large appliance dealer, Broadway-Hale, used its purchasing power to induce defendant manufacturers and wholesalers to sell only at dis-

---

11. The illusory nature of formal economic equality is quite apparent in a time when there exist few jobs and even fewer people have the educational and fiscal advantages needed to pursue those few jobs.

criminatory prices to plaintiff, a competing appliance dealer. Since the effect of the agreement was to drive Klor's out of competition with Broadway, the Court found the three-cornered agreement illegal *per se,* notwithstanding the fact that the manufacturers and wholesalers, not in competition with Klor's probably had no such anti-competitive motive.

Unlike these first two categories, the third group of cases has concerned combinations designed to influence coercively the trade practices of boycott victims, rather than to eliminate them as competitors. The leading case in the area is *Fashion Originators Guild of America v. Federal Trade Comm'n,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), in which a group of "original" designers refused to sell their creations to retailers who purchased and sold copies of the original designs. In holding this refusal to deal illegal *per se,* the Court declared that even though the object of the boycott was to prevent the retailers from dealing with manufacturers of the copies and thereby eliminate "style piracy," the coercion practiced indirectly on a rival method of competition precluded application of the rule of reason.

In all of these cases, the touchstone of *per se* illegality has been the purpose and effect of the arrangement in question. Where exclusionary or coercive conduct has been present, the arrangements have been viewed as "naked restraints of trade," and have fallen victim to the *per se* rule. On the other hand, where these elements have been missing, the *per se* rule has not been applied to collective refusals to deal. *See, e.g., Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 9th Cir.1969, 416 F.2d 71, *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), holding that a concerted refusal by two manufacturers to renew plaintiff's exclusive sales rights was not *per se* illegal because the refusal was motivated solely by the manufacturers' concern for the integrity of their distribution systems. We conclude that resort to the *per se* rule is justified only when the presence of exclusionary or coercive conduct warrants the view that the arrangement in question is a "naked restraint of trade." Absent these factors, the rule of reason must be followed in determining the legality of the arrangement.

*E.A. McQuade, supra,* 467 F.2d at 186–87 (citations omitted). In *Realty Multi-List* we added the following observations:

The presence of purposefully exclusionary or coercive conduct is a strong indication that the boycott is a naked restraint of trade; indeed, if no other purposes are present, this purpose will warrant outright condemnation of the practice. In light of our discussion of the *per se* rule, however, and particularly in light of the *BMI* case, it is also necessary to inquire further to determine whether the practice is at least potentially reasonably ancillary to joint, efficiency-creating economic activities. In *BMI, supra,* the Court held that the *per se* rule was inapplicable to the form of price-fixing practiced by defendants in its blanket licensing system in part because it "accompanie[d] the integration of sales, monitoring, and enforcement against unauthorized copyright use." 99 S.Ct. at 1562. The generalization supporting *per se* treatment lost its force in that situation, and, even though defendants purposefully "fixed a price," it became necessary to assess under the rule of reason the net competitive impact of the practice when compared to the procompetitive effects of the integration. *Id.* at 1565. Similarly, with group boycotts, we must be cautious to determine whether conduct whose apparent purposes, standing alone, might warrant *per se* treatment are reasonably connected to an integration of productive activities or other efficiency-creating activity in such a manner as to require an inquiry into the net competitive effect under the rule of reason. *See* L. Sullivan, Antitrust § 89 (1977).

*Realty Multi-List, supra,* 629 F.2d at 1367.

B. *Per Se Boycott and De Facto Licensing*

We must now decide whether the practice in this case of de facto licensing constitutes

a per se violation of the Sherman Act. The defendants contend that the three types of per se boycotts of *E.A. McQuade* constitute a complete canonical list of all possible per se boycotts. We cannot read *E.A. McQuade* so narrowly. The closing paragraph of the quoted passage states that "resort to the *per se* rule is justified only when the presence of exclusionary or coercive conduct warrants the view that the arrangement in question is a 'naked restraint of trade.'" *E.A. McQuade, supra,* 467 F.2d at 187. This suggests that another sort of boycott, other than the three types enumerated, can be a per se violation if it is a similar sort of naked restraint of trade. In determining whether *this* practice is a similar naked restraint of trade we are guided by *Realty Multi-List.*

This case presents employers of managing officers of savings and loan associations agreeing not to hire managing officers without Vandygriff's approval. This "purposefully exclusionary" conduct "is a strong indication that the boycott is a naked restraint of trade." *Realty Multi-List, supra,* 629 F.2d at 1367. "[H]owever, . . . it is also necessary to inquire further to determine whether the practice is at least potentially reasonably ancillary to joint, efficiency-creating economic activities." *Id.*

The practice here of consulting with Vandygriff has substantial joint efficiency-creating economic potential. As mentioned before, the savings and loan industry is a repository of public trust and confidence. It is vital to the industry that the managing officers of the associations be of highest character and ability. It would be difficult, if not impossible, for every savings and loan association to assume the responsibility of thoroughly investigating the background of each and every potential managing officer. The Commissioner of the Texas Savings and Loan Department is in a unique position to serve as a clearinghouse for information on people working in the industry. Consulting with him with regard to prospective employees is an eminently reasonable technique for reducing the information-collecting costs of the individual savings and loan associations.

Of course, this relates only to the use of Vandygriff as an information resource. The custom of which Phillips complains is that of giving Vandygriff de facto licensing power. Still, we believe that the de facto licensing power is "at least potentially reasonably ancillary" to the practice of using Vandygriff as an information resource. Thus, we conclude that the practice of screening prospective managerial employees with the Commissioner is "at least potentially reasonably ancillary to joint, efficiency-creating economic activities." *Id.* Accordingly, in spite of the purposefully exclusionary conduct inherent in the practice, we conclude that it is not a per se violation of the Sherman Act. Because Phillips does not alternatively argue before us that the conduct is violative of the rule of reason, we affirm the trial judge's summary judgment in favor of the savings and loan associations on this claim and affirm the refusal to submit jury issues on this claim with respect to the then remaining defendants.

## IV. INTERFERENCE

Phillips also presses a pendent state claim for interference. The essence of his claim is that, absent Vandygriff's acts, he would have entered into a contractual relationship with one or more of the savings and loan associations. Because the associations had all agreed to follow the custom of de facto licensing, Phillips argues, they were all guilty of the same tort through civil conspiracy principles. We shall first recap the procedures below, then discuss Vandygriff, and finally, the savings and loan associations.

### A. Procedures Below

The savings and loan associations, except for Paris, were all granted summary judgment on the tortious interference claim. At trial the trial judge submitted issues as to whether defendants Wright, Vandygriff, and the Department had interfered with Phillips' prospective contractual relations with prospective purchasers of Paris. The jury found no interference. Record at 863. Phillips had objected to this charge because

it related solely to his prospective relations with the buyers of Paris,[12] and did not include his prospective employment with the other savings and loan associations. Transcript at 918–19.

### B. Vandygriff

■ Texas provides a cause of action for tortious interference with prospective contractual relations.

> For a plaintiff . . . to prevail, he must show that (1) there was a "reasonable probability" that he would have entered into a contractual relationship; (2) defendant acted maliciously by intentionally preventing the relationship from occurring with the purpose of harming plaintiff; (3) the defendant was not privileged or justified, and (4) actual harm or damage occurred as a result.

*Leonard Duckworth, Inc. v. Michael L. Field & Co.,* 516 F.2d 952, 956 (5th Cir.1975) (Texas law). *See also Verkin v. Melroy,* 699 F.2d 729 (5th Cir.1983) (same).

The record discloses sufficient probative evidence that we believe reasonable jurors might have found that Vandygriff interfered with prospective contractual relations between Phillips and the other savings and loan associations. Without developed jury findings and briefing we will not speculate on all possible states of affairs that would support such a cause of action. Rather, we hold that it was error to remove the question of interference with respect to savings and loan associations other than Paris from the jury. Accordingly, we reverse and remand for further proceedings on this claim against Vandygriff.

### C. The Savings and Loan Associations

This is another example of the defendants not adequately responding to Phillips' claims against them because they misconceived the nature of his claim. Phillips claims that the industry custom allowing Vandygriff to have de facto licensing power over managerial employees resulted in Vandygriff's tortiously interfering with prospective contractual relationships between Phillips and each of the savings and loan associations. Phillips further claims that each savings and loan association, by participating in the custom, became vicariously liable for Vandygriff's acts pursuant to that custom under theories of civil conspiracy. Phillips has some support for his position. *See, e.g., Schlumberger Well Surveying Corp. v. Nortex Oil and Gas Corp.,* 435 S.W.2d 854 (Tex.1968); *International Bankers Life Insurance Co. v. Holloway,* 368 S.W.2d 567 (Tex.1963); *Bourland v. Texas,* 528 S.W.2d 350 (Tex.Civ.App.1975, writ ref. n.r.e.).

Having reviewed the record before the trial court at the time he relied on the motions for summary judgment, we cannot say that there were no disputed issues of material fact regarding this claim. Fed.R. Civ.P. 56(c). Again, we will not attempt to enumerate all the possible circumstances that might be proven to establish the conspiracy claim, but instead merely reverse the summary judgments in favor of the savings and loan associations on the interference claim and remand for further proceedings.

Paris, however, is in a different situation—Paris participated in the trial. No jury issues were submitted with regard to Paris' vicarious liability, and Phillips did not object to this omission. Thus, we affirm the judgment in favor of Paris. Fed.R. Civ.P. 51.

### CONCLUSION

The essence of this case is that the Commissioner of the Texas Savings and Loan Department and various individual savings and loan associations agreed to a custom of de facto licensing of managing officers. This custom has several vices. Most severe among these is the risk that a state officer may foreclose a person from practicing a lawful occupation without affording that person any procedural protections. Second, the practice might, under some circum-

---

**12.** Phillips was trying to arrange the sale of Paris to a group of buyers that would employ him.

stances, result in interference with a prospective contractual relationship that would have been consummated but for the custom. Finally, the apparently uniform participation in the custom by savings and loan associations raises the possibility of vicarious liability.

These problems with the custom, however, are procedural rather than substantive. We certainly do not condemn the basic motivation for the custom: ensuring that managing officers of savings and loans are of the highest character and competence. The virtue of these good intentions is sufficient to save the practice from the fiery pit reserved for per se antitrust violations.

In light of the procedural complexity of this case, with its multiple claims, multiple defendants, and multiple dispositions, we reiterate our disposition of the case. The judgment in favor of defendant Paris is affirmed as to all claims. The judgment in favor of all defendants as to the antitrust claim is affirmed. The judgment in favor of Vandygriff on the civil rights claim is reversed and remanded for further proceedings. The judgment in favor of Vandygriff on the interference claim with respect to Paris is affirmed. The judgment in favor of Vandygriff on the interference claim with respect to the other associations is reversed and remanded for further proceedings. The judgments in favor of the associations other than Paris regarding civil conspiracy, on the civil rights claim and the remaining interference claims, are reversed and remanded for further proceedings.[13]

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

---

**13.** We provide a schematic representation of the claims on appeal, and our disposition of them. Phillips did not appeal as to: (1) Texas Savings and Loan Department; (2) Deputy Commissioner Wright; (3) Aztec Savings and Loan; (4) defamation; (5) interference with prospective contractual relations with Paris. The appealed claims, the trial court's disposition, and our disposition on appeal are as follows:

|  | section 1983 | antitrust | interference with other S&Ls |
|---|---|---|---|
| Vandygriff | JNOV — rev'd | DV — aff'd | DV — rev'd |
| Paris S&L | JV — aff'd | DV — aff'd | DV — aff'd |
| Other S&Ls | SJ — rev'd | SJ — aff'd | SJ — rev'd |