**Glen KARR, Plaintiff,**

v.

**Sheriff Don TOWNSEND, Individually and in his Official Capacity, and Benton County, Arkansas, Defendants.**

**Civ. No. 84–5100.**

United States District Court,
W.D. Arkansas,
Fayetteville Division.

April 1, 1985.

Gregory T. Karber, Pryor, Robinson & Barry, Fort Smith, Ark., for plaintiff.

Xollie Duncan, Deputy Pros. Atty., Bentonville, Ark., E.E. Maglothin, Jr., Fayetteville, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Plaintiff, Glen Karr, from the summer of 1980 to his termination in April of 1984, was a deputy sheriff of Benton County, Arkansas. On April 23, 1984, he was terminated from his employment by the acting sheriff, Don Townsend, who had been appointed pursuant to law by the Quorum Court of Benton County (the legislative body in that county). Mr. Townsend's predecessor, Donald H. Rystrom, had been removed from office for alleged violations of law and violations of the code of ethics while the Sheriff of Benton County.

Plaintiff filed suit against the acting sheriff, Don Townsend, and in his complaint and amended complaint alleges that he was wrongfully terminated, infringing certain constitutional rights. Specifically, he alleges that he was terminated for stigmatizing reasons without being given the opportunity to clear his name and in violation of certain property rights granted to him by the job without a due process hearing. In addition, he contends that Sheriff Townsend libeled him at and after the time of his termination. He seeks judgment against Sheriff Townsend in the amount of $500,000.00; for reinstatement to his job; for past and future wages at the rate of $1,100.00 per month plus all employee benefits that would have been afforded him had he not been terminated; for judgment declaring that his discharge was wrongful; for injunctive relief ordering defendant to cease and refrain from further statements "made damaging to the reputation, liberty and property interests of the plaintiff"; for attorney's fees and costs and all other proper relief.

The court has jurisdiction under the provisions of 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343(3) and (4). The case was tried to the court on January 24 and 25, 1985, and, at the conclusion of the evidence, the attorneys for the parties were given an opportunity to brief the issues. The briefs have been received and considered, and the court is now prepared to rule.

The court has, in the past, expressed its concern about whether federal courts should repeatedly be placed in the position

of substituting the court's judgment for that of elected officials in determining who should be employed by them. See, for example, this court's discussion of that matter in *Johnson v. City Council of Green Forest, Ark.*, 545 F.Supp. 43 (W.D. Ark.1982).

This case amply exemplifies why the court is concerned in that respect. It is only necessary to read the headlines of the various newspaper articles which were submitted as exhibits in this case to understand the court's concern in that regard. (Defendants' Ex. 14, 16, 20, 21, 22 and 23, and Plaintiff's Ex. 11 and 16.) Those newspaper articles demonstrate that there is little chance that the court can have at its disposal, after a couple of days of the structured testimony of a trial, all of the "things" which an elected official must consider to determine who shall work for him, in the interest of the public which he is elected to represent.

Those newspaper articles demonstrate that there was a great deal of controversy in Benton County at the time that this matter arose of considerable public interest. The elected sheriff, Donald H. Rystrom, had just been removed from office because of alleged wrongdoing in office, and Sheriff Townsend had been appointed his successor by the Quorum Court of Benton County, the legislative body for the county authorized by law to make such appointment. It is obvious from the testimony in the case and from a mere reading of these newspaper articles that Sheriff Townsend faced an almost impossible job when he took office because of the very substantial rift that had been created by the Rystrom matter and other matters. In fact, because the problems of the sheriff's office in Benton County are so generally known in this area, the court could probably take judicial notice of the fact that the job of sheriff in Benton County, for the last several years, has had a "checkered" history. The record reflects, and the newspaper articles indicate (for example, Defendants' Ex. 14) that the rift in the sheriff's office caused by the Rystrom matter existed to the extent that even before the incident which resulted in this lawsuit occurred, five other deputies either quit or were fired after the removal of Rystrom from office. The incident which resulted in this lawsuit not only resulted in the termination of Karr, but two other deputies, Capt. Rymer Clark and Lt. Jerry Price.

The record reflects that, after the termination of Karr, Price and Clark, there was a great deal of news media interest in the matter, and that the persons terminated tried their case in the newspapers by making rather blunt, and sometimes venomous, comments about Sheriff Townsend and the way that he was running his office. For example, the Northwest Arkansas Morning News, in an article dated April 20, 1984 (Defendants' Ex. 14), quoted Karr as saying, "As long as the office is being run by Clinger and not the Sheriff, I'd rather not work there anyway." In that same article, the reporter quotes Rystrom as saying that "a lot of taxpayers' money is going down the drain" and that the sheriff's office should be investigated. The persons terminated are also quoted in that article as indicating that it is their belief that the termination was political since one of those terminated, Jerry Price, was running for sheriff of Benton County at the time. A letter to the editor from plaintiff Karr published in the Rogers Daily News on May 6, 1984 (Defendants' Ex. 21), contains the following allegations by Karr:

> Why do you suppose some officials in Benton County are trying to discredit me and my family? Is it the fact that I testified to the truth at the Rystrom trial? Is it the fact that my wife is running for justice of the peace? Do I know too much?

In addition to the outright allegations of wrongdoing by the sheriff's office headed by Sheriff Townsend, and the thinly veiled implication by Karr that he was being persecuted either because he testified for Rystrom at Rystrom's criminal trial; that his wife was running for the quorum court; or that he "knew too much," the evidence indicates that the attacks became viciously

personal. A May 10, 1984, article in the Benton County Daily Democrat (Defendants' Ex. 22) indicates that questions were raised in the news media by some of those terminated about whether Sheriff Townsend had received a discharge "other than honorable" when he was discharged from the Marine Corps after serving in Vietnam 16 years before.

There is additional testimony in the record and additional evidence in the form of trial exhibits such as the news media reports which indicate that the atmosphere in the sheriff's office at the time that Rystrom was removed from office and Townsend was appointed to get control of and run the office was highly charged, to say the least. The court believes that the summarization of the circumstances set forth above is important to understand the evidence adduced in relation to the allegations of the complaint and amended complaint, and to properly set the stage for the court's analysis of the testimony and other evidence which is relevant to the allegations of the plaintiff. The court believes that these circumstances and the atmosphere created by the matters set forth above is particularly important when considering a case involving the termination of a deputy sheriff in a county such as Benton County which is largely rural in nature, with its law enforcement duties depending to a great extent upon the sheriff and his few deputies. For an excellent discussion of the need to balance individual rights perceived by some courts to be dictated by the Constitution, with the public interest, see *McBee v. Jim Hogg County, Texas, et al.*, 703 F.2d 834 (5th Cir.1983).

The above discussion by the court of the circumstances leading to this controversy was not made to, in any way, attempt to justify any violation of plaintiff's constitutional rights at the time that he was terminated. Instead, as already indicated, the court believes that the matters recited above are relevant and necessary to a proper understanding of the evidence which this court must analyze to decide the issues before it. The court willingly accepts its responsibility to analyze that evidence to determine whether Mr. Karr's rights as delineated by courts superior to this one have, in fact, been violated by the manner in which he was terminated as a deputy sheriff of Benton County.

In that regard, plaintiff's allegations may be summarized as follows:

(a) The reasons given for his termination at the time were stigmatizing and that, thus, he was denied liberty without due process of law in that he was not provided a name-clearing hearing prior to his termination.

(b) The reasons given for his termination by Sheriff Townsend were libelous *per se.*

(c) He was denied property without due process of law in that he had a property right to his job and was not provided a hearing prior to termination.

The court will discuss these issues in the order listed above.

### Right to Name-Clearing Hearing

There are two circumstances which are at least arguably applicable to this case in which the United States Supreme Court has found that a public employee is entitled to a hearing prior to termination. One of those is where the circumstances show that the employee was denied "liberty" without due process of law, and the other is where he has a property interest in his employment and is thus deprived of a property right without due process of law when terminated without a hearing. In this portion of this opinion, the court will discuss the "liberty" interest aspects of the case.

█ It is well settled that mere termination or dismissal of an employee from governmental employment is not a deprivation of a protected liberty interest. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), at 599, 92 S.Ct. at 2698; *Bd. of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), at 576, 92 S.Ct. at 2708; *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), at 348, 96 S.Ct. at 2079; *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977).

However, it has also been long settled that the term "liberty" as used in the Fifth and Fourteenth Amendments is not confined to mere freedom from bodily restraint. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Bd. of Regents v. Roth, supra.* The liberty interest also includes the exercise of fundamental constitutional rights and other forms of freedom of activities. Any governmental restraint of constitutionally recognized "liberty" requires the protection of procedural due process.

In order to fall within the prohibition of the due process clause, the employee must suffer some deprivation of liberty at the hands of the governmental employer other than loss of employment itself, *Roth, supra; Sindermann, supra; Codd v. Velger, supra.* The Supreme Court has held that mere injury to reputation alone does not constitute a deprivation of liberty. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

Plaintiff, however, contends that he was discharged under circumstances which created a stigma which foreclosed his freedom and ability to seek other employment. In *Bd. of Regents v. Roth, supra,* the Supreme Court suggested that where the employer publicly disseminates a charge against the employee which might seriously damage his standing and associations in the community, a protected liberty interest may be triggered. *Roth, supra,* 408 U.S. at 573, 92 S.Ct. at 2707. However, in *Paul v. Davis, supra,* the Supreme Court narrowed somewhat the seemingly broad language of *Roth* and *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), and set forth the factual prerequisites of an actionable procedural due process violation. There must be (1) defamation, and (2) the defamation has to occur in the course of the termination of employment. *Paul v. Davis, supra,* 424 U.S. at 710, 96 S.Ct. at 1165, and *Harnett v. Ulett,* 466 F.2d 113 (8th Cir.1972).

However, the Court of Appeals for the Eighth Circuit, the court whose decisions are binding on this court, has construed *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), in such a way that the mere failure to provide a due process hearing prior to termination may be actionable even if such hearing would have accomplished nothing because the charges were true and, thus, the terminated employees could not have cleared their names even if a name-clearing hearing had been afforded. In a case out of this court, *Pollock v. Baxter Manor Nursing Home,* 536 F.Supp. 673 (W.D.Ark.1982), this court found that although a name-clearing hearing was not provided the terminated employee, she was not harmed because the charges made at the time of her termination were true. A panel of the Court of Appeals for the Eighth Circuit, consisting of Judges Henley, Ross and McMillian, in 706 F.2d 236, affirmed, holding that "we agree that under the facts of this case, Pollock does not prevail because a liberty interest does not arise unless an employer disseminates a false and defamatory statement." Judge McMillian wrote a dissenting opinion in that phase of the case.

Then, on rehearing, 716 F.2d 545, the same panel, with Judge Henley dissenting, "changed its mind" and, essentially, adopted the position of Judge McMillian in his earlier dissenting opinion.

In that decision, at 546, the Court of Appeals framed the issue as follows:

A fundamental purpose of the due process clause is to allow the aggrieved party the opportunity to present his case and have its merits fairly judged. *Logan v. Zimmerman Brush Co.,* 445 U.S. 422 [102 S.Ct. 1148, 71 L.Ed.2d 265] (1982). Pollock was not given such an opportunity. Thus, the issue becomes whether Pollock is entitled to damages to remedy the lack of due process afforded her by the nursing home.

The Court of Appeals then answered the question that it asked:

It is clear that the court in *Carey* determined that a plaintiff is still entitled to nominal damages for failure to hold a

due process hearing even if it is shown that the stigmatizing information is true. In the instant case, the nursing home refused to conduct a due process hearing and thereby violated Pollock's right to procedural due process. We, accordingly, reverse the district court and order that Pollock be awarded nominal damages of $1.00 and reasonable attorney's fees.

Thus, the law in the Eighth Circuit appears to be that it is not really necessary that a party suing under section 1983 for the violation of a liberty interest show that he has been defamed. The court seemed to say in those opinions that if the reasons given are defamatory in nature if not true, and if the employee is not given an opportunity to rebut them, even though such hearing would be fruitless, he is still entitled to nominal damages and attorney's fees if he is not afforded the opportunity to futilely try to clear his name at a name-clearing hearing.

Thus, this court believes that it is its duty to analyze the testimony in this case to determine whether the plaintiff has proved, by a preponderance of the evidence, that stigmatizing reasons were given at the time of his termination without being afforded a due process hearing. It appears that if such stigmatizing reasons were given and he was terminated prior to having a name-clearing hearing, he may recover consequential damages if the court believes, from the evidence adduced, that the hearing would have accomplished something for Mr. Karr, but that he is still entitled to nominal damages and attorney's fees if the court finds that the evidence proves only that he was terminated without a hearing for reasons which would be stigmatizing if false.

The facts relevant to a determination of this issue appear to be relatively uncontroverted. Karr was hired as a paid employee of the Benton County sheriff's office in the summer of 1980. In his personnel file, which was introduced as Plaintiff's Ex. 2, there is an undated application completed in Karr's handwriting in which he was asked, among many other things, to "list any criminal arrests (felonies or misdemeanors), either as a juvenile or an adult." The form then provided space for the charge, location, date and disposition to be shown. Although Karr completed most of the form, including much more insignificant things than what was requested in this question, such as whether he had ever had an account placed in the hands of a collecting agency, he failed totally to complete this portion of the form. Karr was hired and was certified as a law enforcement officer by the Law Enforcement Standards and Training Commission, which is authorized by relevant Arkansas law to certify law enforcement personnel. Then, some time prior to April 12, 1984, Karr applied to the Commission for an upgrading of his status. As a result of the investigation performed by the Law Enforcement Standards and Training Commission, Harold R. Zook, Deputy Director of the Commission, wrote Capt. Rymer Clark, who was then employed in the sheriff's office, a letter which was introduced as Plaintiff's Ex. 4. In essence, that letter stated that the department's investigation found that Karr had been charged in Illinois in 1965 with felony theft of property and that he had "entered a plea of guilty to the charge, found guilty, placed under court supervision for one year, and was ordered to appear again on 01–03–67." The letter goes on to say that upon completion of the terms of probation, the felony charge was reduced to a misdemeanor. Zook then cited in the letter Ark.Stats.Ann. § 42–1007 which prohibits a convicted felon from being eligible for certification as a law enforcement officer in the State of Arkansas, and concludes: "As a result of these findings Mr. Karr is not eligible for certification as a law enforcement officer, therefore, your request for certification is being returned without action."

The letter indicates that it confirms a telephone conversation that Zook had with Rymer Clark on April 9, 1984. The evidence shows that Clark did not call either the telephone conversation or the letter to Sheriff Townsend's attention for several

days after the telephone conversation and after the letter was received, and, in fact, the evidence indicates this was one of the reasons for Clark's termination. In any event, upon having the letter called to his attention, somewhat belatedly, Townsend consulted with the Prosecuting Attorney for Benton County and concluded that he had no choice but to terminate Karr because state law did not permit him to remain as a deputy sheriff without certification. By letter dated April 23, 1984, Townsend advised Karr of this decision, stating nothing more than that the minimum standards commission had advised him that "you are not eligible for certification and are no longer eligible to work as a law enforcement officer in the State of Arkansas."

Evidence at this point became disputed as to what occurred after that, but it is clear that news media representatives in Northwest Arkansas became aware of the firings and became quite interested in them. Sheriff Townsend testified at the trial, and the court was impressed by his apparent honesty, candidness, and integrity. The court has little difficulty believing that Sheriff Townsend did at the time what he thought that he was required to do, after receiving legal advice from the Prosecuting Attorney's office as to the requirements of law. The court believes that Townsend took great pains not to publicize the reasons for the termination, but, in any event, as evidenced by the newspaper articles which were introduced into evidence and already discussed, the reasons for the termination became public. The court believes Sheriff Townsend's testimony in respect to his discussions of this matter with the news media, and believes and finds that he only answered questions asked by news media representatives, and only advised them of the reasons given in Zook's letter. Frankly, however, the court is not totally convinced from the evidence that another elected official of Benton County did not go further in this respect than had Sheriff Townsend, and it appears that the Prosecuting Attorney made statements which, at least with the benefit of hindsight, were inadvisable.

In this respect, the Northwest Arkansas Morning News article of April 20, 1984 (Defendants' Ex. 14), which appears to be the first article on the subject, quotes Prosecuting Attorney Clinger as stating that Rystrom "received a similar letter about Karr from the Commission in 1982 asking him to investigate the matter." Sheriff Townsend testified that he did not know of this letter at the time that he terminated Karr, and did not find out about it until he found the letter after the termination and after Clark's termination while going through Clark's desk. He says that at that time he found the letter which Clinger apparently referred to in the interview. That letter, contained in the personnel file, introduced as Plaintiff's Ex. 2, was also by Harold Zook, and, contrary to what Zook said in the later letter, stated "that Karr was charged with felony theft, the felony was reduced to a misdemeanor and Mr. Karr entered a plea of guilty." The letter goes on to "urge you to consider his involvement in felonious activity when you evaluate his suitability as a law enforcement officer in the State of Arkansas." The court has little difficulty in finding that Townsend was not aware of this letter at the time of the termination, but that Clinger, if the news article is to be believed, apparently was. The court has difficulty not believing the news article in this respect, because it appears to be about the only explanation for the news media knowing of the letter.

This fact tends to give credence to Karr's claim that Clinger had told him after he testified for Rystrom in the criminal trial that he would "get his job," a claim that the Prosecuting Attorney denies. In this respect, there is ample evidence that Clinger did, after the Rystrom testimony, require all contacts from Karr to his office be in writing.

In any event, Sheriff Townsend, acting after receiving legal advice from the proper officer to give him such advice, and after understandably and rightfully believing

that the Commission on Law Enforcement Standards and Training had determined that Karr was not qualified to be a law enforcement officer in Arkansas under Arkansas law, terminated him. Although the court believes that Townsend was acting in good faith, the court has no choice but to determine that the reasons given for Karr's termination were stigmatizing and that he was entitled to and did not receive the opportunity to clear his name at a proper due process hearing.

Before Townsend terminated Karr, he called Zook and asked Zook if the facts set forth in his April 12, 1984, letter were accurate, and Zook told him, in effect, that they were and that he would "stand by them one hundred percent." Zook, during his testimony, did not deny this claim by Townsend, and seemed to agree that such a call had occurred. In spite of this, by letter dated May 11, 1984, directed to Sheriff Townsend, Zook, in effect, pulled the rug from under Townsend by advising him that in spite of the rather clear pronouncement of his earlier letter, it appeared that Karr had not, in fact, pled guilty to a felony charge and that Karr was, after all, and in spite of what he had earlier said, eligible for certification. In short, Zook in the May 11, 1984, letter, retreated from the strong position that he took in his April 12, 1984, letter. In this respect, the court feels compelled to state that, at least in the court's view, Mr. Zook, during his testimony at the trial, during direct examination by the attorney for the plaintiff, in effect, "ran for cover" by stating that he had not advised Sheriff Townsend that Karr could not be certified and, thus, could not continue as a law enforcement officer. However, upon questioning by the court, and after the court pointed out the rather unequivocal statement contained in the penultimate paragraph of the April 12, 1984, letter, Mr. Zook, the court believes, changed his position again and agreed that any reasonable person reading his letter would conclude that what he was telling them was that Karr was not eligible for certification and could not remain a law enforcement officer under the law of the State of Arkansas.

After Townsend received what turned out to be Zook's third letter on the subject, each, in the court's view, taking a different position, Sheriff Townsend wrote Karr a letter dated May 16, 1984 (Plaintiff's Ex. 7), advising him of Zook's change of heart and changed decision. In that letter Townsend advised him that if he wished to seek reinstatement, he could do so by contacting Townsend's secretary. On May 31, 1984, a recorded meeting was held in Sheriff Townsend's office attended by Karr and his attorney and by Sheriff Townsend and David Clinger and one of his deputies. The transcript of that discussion was introduced as Plaintiff's Ex. 8, and a mere reading of this shows that, by this point the parties, including the attorneys, had become intransigent, and that nothing was accomplished. This court is convinced that one of the most valuable services that lawyers can provide their clients is to attempt to provide them a vehicle and a means by which matters such as these can be "ironed out" to the satisfaction of all concerned. Mr. Karber kept insisting during the meeting that the only purpose of the hearing was to provide Karr with an opportunity to clear his name, and the other side insisted that the allegations which Karr had made to the news media in relation to how Townsend was doing his job be first cleared up. In fact, the record reflects that, by this point, Karr's name had been cleared to the extent that it could be. Zook had apparently stopped waffling and had concluded that the record did not, at least clearly, reflect that Karr had been convicted of a felony.[1]

---

1. The court heard a considerable amount of testimony on this point, and it is not at all clear exactly what happened in Illinois several years ago. However, it does appear clear that Karr was, in fact, charged with felony theft and that he did plead guilty to doing what he was charged with doing. The only argument is whether that plea resulted in a felony conviction or a misdemeanor conviction. The evidence indicates that at some point either before or at the time of the plea, the charges were modified to charge Karr with stealing property of a lesser value than earlier alleged. After the modifica-

By the time of this recorded interview, both the public and Karr had been advised of Zook's change of heart. The Benton Count Daily Democrat in an article dated May 10, 1984 (Defendants' Ex. 22), disclosed, in bold headlines that "**NO FELONY ON KARR.**" The article describes in detail the series of Zook letters already described and gives Karr's version of the Illinois incident. In spite of the fact that it appears to this court that everything had been done that could be done to clear Karr's name at the time, during the recorded interview, his attorney insisted that a name-clearing hearing be held, and Townsend's attorneys did not, according to the content of the recorded interview, help the problem by giving the sheriff the kind of help and advice that he should have received in these times that were obviously trying for him. He was understandably concerned about the allegations which had been spread across all of the newspapers that are distributed in the area, and the court believes that it was understandable that he wanted to make certain what Karr's attitude was before he reinstated him. Karr's attorney, in effect, insisted that that not be discussed, and Townsend and his attorneys insisted that it first be discussed. The meeting ended with Karr and his lawyer leaving the meeting, with absolutely nothing being accomplished.

■ Where does all of this lead the court? The court has no choice but to conclude that the evidence conclusively shows that Karr was terminated and that at the time of his termination and during the course of it, stigmatizing reasons were given. It is further evident that, under the law which this court is bound to follow, Karr was entitled to a name-clearing hearing *before* he was terminated. As indicated, the law in this circuit appears to be that he may recover at least nominal damages and attorney's fees even if the court were to conclude that the hearing would have accomplished nothing. However, in this case, the court cannot even conclude that. If Sheriff Townsend's attorneys had

advised him that the law required that Karr be afforded a hearing before termination, as it clearly does, and had such hearing been held, it is at least possible that Zook would earlier have reneged on the rather clear pronouncements contained in his April 12, 1984, letter, and Karr would not have been fired. Presumably, if he had not been fired, the spate of news articles which ensued would not have occurred, or at least Karr would not have been involved in them, and the impossible situation which the court believes existed after those articles would not have developed. In short, the court cannot say that a name-clearing hearing which is clearly required by law would not have accomplished something had it been held. The court can find without difficulty that a name-clearing hearing would not now accomplish anything because the "facts" have been developed and have been made public. However, under the law, that came approximately 30 days too late.

Irrespective of how the court might personally feel about what is "right" and what is "wrong" in this particular case, it perceives its duty to be to determine the applicable law on the subject as set forth by courts which are superior to this one, and whose decisions are binding on this court, and after once making such determination, to apply the law. When this is done, the court has no choice but to hold that Karr was fired for stigmatizing reasons without being given an opportunity to clear his name. The court must further conclude that it cannot say that such a hearing would have been fruitless in this particular case. Thus, Mr. Karr is entitled to certain relief which will be discussed in more detail in the Conclusion portion of this opinion. See the two opinions of the Court of Appeals for the Eighth Circuit in the *Pollock* cases, *supra*.

### Libel

■ As indicated, Karr alleges that he was libeled by Sheriff Townsend. For the reasons already set forth in this opinion,

tion, he pled guilty, made restitution, and was placed under court supervision for one year.

the court, which had an opportunity to view the witnesses and judge their credibility, believes Sheriff Townsend's testimony in respect to what occurred. The court is convinced and finds that, unlike what the record reflects in relation to other persons involved in this matter, he did not invite discussions with the news media and only answered questions when asked. The court finds that he did not disclose the reasons for the termination to the news media, but only answered questions after the representatives of the news media had already discovered the reasons, and asked him specific questions about them. Even then, all that Sheriff Townsend did was advise the person attempting to interview him of the reasons set forth in Zook's April 12, 1984, letter, and this occurred after they were already aware of the reasons, either from Karr himself or from David Clinger. Thus, Townsend did no more than "state the truth" when specifically asked, and did not, in any respect, libel Karr. He did not publish or distribute the reasons given for the termination because they had already been distributed or published. The court finds that there is absolutely no basis for a judgment against Townsend on the libel theory, and it would not serve a useful purpose to engage in a lengthy discussion of the law in respect to this claim. Suffice it to say that the court is convinced that Sheriff Townsend, in replying to news media questions, did not come close to breaching the bounds of the qualified privilege afforded pubic officials in Arkansas. *Dillard Department Stores, Inc. v. Felton,* 276 Ark. 304, 634 S.W.2d 135 (1982), and *McClain v. Anderson,* 246 Ark. 638, 439 S.W.2d 296 (1969).

■■■ In any event, the court is equally convinced that Deputy Sheriff Karr, "having substantial responsibility for or control over the conduct of government affairs at least where law enforcement and police functions are concerned," is a public official. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), and *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). The evidence falls far short of showing that Sheriff Townsend's conduct was reckless or conducted with actual malice. *St. Amant, supra,* and *Gallman v. Carnes,* 254 Ark. 987, 497 S.W.2d 47 (1973).

### Property Right

Since the court has already concluded that plaintiff is entitled to the relief which the law affords him where he has been deprived of a liberty interest, and since the law appears to authorize the court to provide similar relief where a person has been deprived of a property interest without due process of law, it would appear not to be necessary for this court to decide that issue. However, the court will discuss that issue briefly.

■■■ Unless the county personnel policy discussed below provides him with a property interest, it is clear that Karr's employment was terminable "at will" under Arkansas law. *M.B.M. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980); *Miller v. Missouri Pacific Transportation Co.,* 225 Ark. 475, 283 S.W.2d 158 (1955). Plaintiff's employment was not under tenure or contract, nor was there any clearly implied promise of continued employment unless the personnel policies accomplished this. Thus, at least absent the personnel policy, plaintiff had no legitimate claim of entitlement to employment. *Bd. of Regents v. Roth, supra; Slochower v. Board of Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); *Connell v. Higginbotham,* 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971). Unless the county personnel policies legally and effectively granted to the plaintiff the contractual right to his employment or a legally enforceable expectancy of continued employment, it granted to him no property interest protected by the due process clause of the constitution. *Bd. of Regents v. Roth, supra,* and *Perry v. Sindermann, supra.*

The court has carefully reviewed the county personnel policy contained in Plaintiff's Ex. 1 and concludes that nothing in

these policies gave to the plaintiff the type of legally enforceable expectancy of employment protected by the due process clause of the Constitution. Section 11 of these policies provides that an employee who is involuntarily terminated for any reason other than as a result of disciplinary action, will be given at least two weeks notice. Thus, the policy obviously contemplates termination for reasons other than as a result of disciplinary action. There is nothing contained in the policy which the court believes supports an argument that any employee of Benton County has a legally enforceable expectancy of continued employment. Section 17 provides for the manner in which disciplinary action shall be taken, but, in the court's view, clearly does not provide an expectancy of employment. The grievance procedure contained in Section 18 provides a procedure for processing grievances, but, again, does not promise the employee any right to continued employment.

It is true that there was testimony at the trial which indicates that a county employee, after expiration of the probationary period, expects that he will have a job as long as he does it. That is true throughout government and industry, but that alone, in the court's view, does not grant to such employee a legally enforceable contractual right to his job. These are the only provisions of the personnel policy that even arguably might affect this issue, and the court concludes that they simply do not provide the employee with the type of property interest protected by the due process clause of the Constitution.

In any event, even if they did, the court is not at all certain that they would grant to the employees of the Benton County Sheriff's Office a legally enforceable right. See the court's discussion on this point in *Horton v. Taylor*, 585 F.Supp. 224 (W.D. Ark.1984). In addition, it should be pointed out that article IV, section 1, of the Arkansas Constitution provides that "[T]he powers of the government of the State of Arkansas shall be divided into three distinct departments, each of them to be confided to a separate body of magistracy, to wit: Those which are legislative to one, those which are executive to another, and those which are judicial to another." Article IV, section 2, provides that "[N]o person or collection of persons, being one of these departments, shall exercise any power belonging to either of the others, except in the instances hereinafter expressly directed or permitted." As the court indicated in the *Horton* case, *supra,* it believes that it would be in violation of the Arkansas Constitution for the legislative body in Benton County to attempt to dictate to elected officials in another, independent branch of government who their employees should be. The Constitution separates the functions of the separate branches, and applicable Arkansas law, Ark.Stat.Ann. §§ 76–3601, *et seq.,* and, in fact, the county personnel policy recognizes the separation of power. Section 3 provides that the county judge shall hire all county employees *except those employed by other elected officials* (emphasis supplied).

In any event, the court concludes, for the reasons set forth above, that the Benton County personnel policy did not grant to plaintiff Karr a legally enforceable property right in his employment, even if it is assumed *arguendo* that the quorum court had the power to do so. Thus, the court concludes that plaintiff Karr is not entitled to recover on his allegations in relation to the denial of a property right without due process of law.

### Conclusion

Where does all of this leave us? As already indicated, the court is convinced that the evidence in this case shows that, as a practical matter, Karr's name has already been cleared to the extent that it is going to be. It appears that all of the "facts" which would have been brought out at a name-clearing hearing have been disclosed, not only in Mr. Karr's personnel file, but to the public in general. Any person in Benton County who reads newspapers knows, possibly more than he cares to, about the allegations and the disposition of them. The personnel file contains all of

the Zook letters, including the one in which he retracted his earlier finding that Mr. Karr was not qualified to serve as a law enforcement officer in Arkansas. In addition, the letter from Townsend advising him that he could reapply for his job is in his file. Thus, both the file discloses and the public knows exactly what the file would have disclosed and the public would have known had the hearing been timely held as the law requires. If the hearing had been held, the file would have disclosed, as it does now, and the public would have known, as it does now, that Karr in 1965 was arrested in Rolling Meadows, Illinois, and charged with felony theft of property. Such hearing would have further disclosed, as everyone now knows, and as the file reflects, that Harold R. Zook, the Deputy Director of the Law Enforcement Standards and Training Commission for the State of Arkansas, wrote the Sheriff's Department advising that Mr. Karr, having been convicted of a felony, could not be certified as a law enforcement officer and that his "certification was being returned." The file would have reflected, approximately 30 days earlier than it did, and the public would have known, approximately 30 days before it did, that on May 11, 1984, Zook retracted his earlier decision in this respect and advised Sheriff Townsend that it appeared that the records in Illinois indicated that the felony theft charges were reduced to a misdemeanor theft charge involving the alleged stealing of the same piece of property, and that Karr then entered a plea of guilty to the misdemeanor offense. In short, the court is amply convinced that a hearing at the time of termination would have, more than likely, put the parties in exactly the same position at that time that they were in by the middle of May, 1984. The hearing would have disclosed, as the court is convinced the evidence in this case does, that this entire matter was caused by the inept handling of the matter by the Law Enforcement Standards and Training Commission as evidenced by the contradictory positions taken by it as shown by the letters and actions discussed above, and by ill advised actions taken at the time of termination upon legal advice received by Sheriff Townsend.

Again, however, the court is convinced that it is bound in this case by what it perceives to be the clear pronouncements of the Court of Appeals for the Eighth Circuit. In *Wellner v. Minnesota State Junior College Board*, 487 F.2d 153 (8th Cir.1973), the court was faced with a similar situation. In that case, the district court held that a fired teacher of a junior college was entitled to a name-clearing hearing and did not receive one at the time of his termination. However, the court further held that a hearing, at that late date, would accomplish nothing, and refused to order one. In reversing in part, the court of appeals stated:

> Wellner was improperly discharged because he was not accorded an appropriate hearing. His termination was therefore a nullity and he remains on the payroll until a proper hearing is held, at which time he may be retained or not reappointed. It is not within our province to speculate that after a proper hearing clearing his reputation the Board will recommend that Wellner not be reappointed, or that the appropriate official will not reappoint him to a similar teaching position. In any event, Wellner remains on the payroll and is entitled to receive the wages he will have earned until his name is cleared by proper Board action and the decision is properly made with respect to whether he will be reappointed. However, any award shall be reduced by interim earnings he may have derived from other employment.

■ Thus, the law that is binding on this court appears to clearly be that even though this court does not believe that a hearing in this case would accomplish anything, it still is required to find, and does find, that Karr shall be considered, for salary and fringe benefit purposes at least, to have been an employee of the Benton County Sheriff's Department from the time of his termination until he is either reappointed or discharged after the hearing re-

quired by the law discussed above is afforded to him.

Plaintiff has prayed for other consequential damages in the sum of $500,-000.00. The court finds that the plaintiff has failed to meet his burden of proving any additional consequential damages in this case. As indicated above, his personnel file, and his reputation in the community is in exactly the same "shape" as it would have been had a hearing been held at the time of his termination. Thus, his remedy in this case as required by *Wellner, supra,* is that he be considered, for salary and fringe benefits purposes, to have remained an employee of the Benton County Sheriff's Department from the time of his termination until he is provided the opportunity for the hearing required by the cases discussed above. At such time, as *Wellner* points out, he may be retained or not reappointed. In this regard, the court desires for it to be clear that it is not ruling that the Sheriff's Department must retain Karr as a deputy. Nothing in the law requires that. The court has held that Karr is an "at will employee" and, thus, the present sheriff of Benton County may decline to retain him after the hearing for any reason not prohibited by the United States Constitution or federal law.

The court recognizes that, at least to a lay person reading this opinion, and perhaps to may lawyers, what the court has required in this case is futile, accomplishing little other than to award Mr. Karr some money and his attorney some attorney's fees. Discussion of the court's beliefs in that regard would accomplish nothing. Suffice it to say the court is convinced that the applicable law is such that what the court has required is required. This, in the court's view, could have been avoided by competent handling of this matter by the State of Arkansas Law Enforcement Standards and Training Commission and by better reasoned legal advice to Sheriff Townsend at the time of the termination.

A separate judgment in accordance with this memorandum opinion will be concurrently entered.