**Patricia HOUSE, Plaintiff,**

**v.**

**UNIVERSITY OF CENTRAL ARKANSAS By and Through the BOARD OF TRUSTEES OF the UNIVERSITY OF CENTRAL ARKANSAS, Defendants.**

**Civ. No. LR–C–87–564.**

United States District Court,
E.D. Arkansas,
Little Rock Division.

April 12, 1988.

Samuel A. Perroni, Little Rock, Ark., for plaintiff.

Jennifer Love, Asst. Atty. Gen., Little Rock, Ark., for defendants.

**MEMORANDUM OPINION**

H. FRANKLIN WATERS, Chief Judge.

*Introduction*

This is an action brought pursuant to 42 U.S.C. § 1983 by plaintiff, Patricia House, to redress an alleged deprivation of Constitutional rights in connection with her position as an instructor in the nursing department at the University of Central Arkansas

**224**

(hereinafter "the University" or "UCA"). The defendant is captioned as the University of Central Arkansas by and through the Board of Trustees of the University of Central Arkansas.

Plaintiff filed a complaint on August 17, 1987, alleging UCA officials deprived her of liberty and property without due process in violation of the First and Fourteenth Amendments. Specifically, Ms. House contends she was discharged after being granted tenure without notice of the reasons for the Board of Trustees' (hereinafter "Trustees") action and without an opportunity for either a pre-termination hearing or a post-termination hearing. Further, Ms. House claims UCA officials made stigmatizing statements to the press implying wrongdoing on her part in the initial grant of tenure. Plaintiff seeks injunctive and declaratory relief in addition to monetary damages.

In response to the allegations in the complaint, the Attorney General filed a motion to dismiss contending UCA was an entity so closely aligned with the State of Arkansas that it was immune from suit under the Eleventh Amendment. The damage claim against the University was dismissed on this ground by order of the court on December 31, 1987. The remaining claims for injunctive and declaratory relief against UCA and the Trustees in their official capacities were allowed to proceed. Plaintiff was also allowed to continue to seek damages against the Trustees in their individual capacities.

On January 27, 1988, defendants filed a motion for summary judgment on the Fourteenth Amendment claim and a motion to dismiss the First Amendment claim. Plaintiff agreed to dismiss her allegations of a First Amendment violation but contested the summary judgment motion. Both parties have provided the court with substantial documentation in accordance with Federal Rule of Civil Procedure 56.

It is the court's duty to review these documents and determine whether there is a genuine issue of material fact in dispute or whether the matter is one that can be decided on purely legal grounds. *Hollo-*

*way v. Lockhart,* 813 F.2d 874 (8th Cir. 1987). Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions to the file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Flittie v. Solem,* 827 F.2d 276 (8th Cir.1987).

After reviewing the materials submitted by the parties, the court has determined this case is one in which there is not sufficient disagreement on the material facts to require submission to a jury. The documents submitted by the parties also demonstrate the defendants are entitled to judgment as a matter of law. Accordingly, a summary judgment is appropriate.

*Facts*

Plaintiff accepted employment as an instructor of nursing at the University on August 15, 1980. The Department of Nursing is a part of the College of Fine and Applied Arts and Sciences. Ms. House accepted tenure track appointments at the rank of instructor for the following school years: August, 1980, to May, 1981; August, 1981, to May, 1982; August, 1982, to May, 1983; August 1983, to May, 1984; August, 1984, to May, 1985; and January, 1986, to May, 1986. Ms. House was on academic leave from August to December, 1985.

The scope of a tenure track appointment is limited by the UCA Faculty Handbook which provides:

The total number of years which a faculty member appointed in the tenure track may serve without tenure shall not exceed seven. If a person has received initial appointment at the rank of instruc-

tor or assistant professor and has served for six years in the tenure track, tenure must be awarded or service must be terminated with the expiration of the next one-year term appointment. [Plaintiff's Ex. A].

Dr. Betty L. Martin, Chairperson of the Nursing Department, notified plaintiff on September 25, 1985, that she should apply for promotion or tenure or both during the 1985–86 school year. [Defendants' Ex. B]. Ms. House satisfied all the criteria to be eligible to apply for tenure with one exception; she had not achieved the appropriate rank to be tenured. Under the provisions in the handbook:

Tenurial academic ranks are those of Assistant Professor, Associate Professor, and Professor. In certain cases of institutional, programmatic, or departmental need and exceptional individual merit, however, the Vice President for Academic Affairs may, at his discretion, approve special consideration of an Instructor for tenure status.

[Plaintiff's Ex. A]. Ms. House applied for both a promotion to Assistant Professor and for tenure. The application process is diagrammed on page 51 of the UCA Faculty Handbook. [Plaintiff's Ex. A].

In accordance with this procedure, plaintiff presented her application with supporting materials to her Department Tenure Committee. This Committee was made up of tenured faculty members in the Department of Nursing. The Committee reviewed the file and unanimously recommended to Dr. Martin that Ms. House be denied tenure. Dr. Martin informed Ms. House of the Committee's decision on January 17, 1986. [Defendants' Attachment No. 2]. Ms. House requested that her application be allowed to proceed to the College Tenure Committee. [Defendants' Ex. B]. This Committee was made up of seven tenured faculty members of the College of Fine and Applied Arts and Sciences. The Committee reviewed the application and sent a negative recommendation to the Dean of the College, Dr. Neil Hattlestad. The College Tenure Committee based its recommendation on an "absence of re-search, inadequate material in support of tenure, and the fact that tenure was denied by the tenure committee of the Department of Nursing and the applicant's department chair." [Defendants' Attachment No. 3]. Based upon an independent review of the file, Dr. Hattlestad also gave plaintiff a negative recommendation. [Defendants' Attachment No. 3]. Dr. Hattlestad informed plaintiff and Dr. Martin of the negative recommendation on February 12, 1986. Ms. House elected not to withdraw her application and asked to have it forwarded to the Vice–President for Academic Affairs, Dr. Robert McChesney. Dr. McChesney decided not to recommend Ms. House for tenure or promotion and notified her and her husband of their options on February 24, 1986. Dr. McChesney told Mr. and Mrs. House that if the application were withdrawn no evidence of the negative recommendations would appear in her employment record with UCA.

On February 25, 1986, Ms. House sent Dr. McChesney the following handwritten note:

This is written to inform you that I have decided to withdraw my application for promotion and my application for tenure for the 1985–1986 school year from consideration.

[Defendants' Ex. B].

Whether or not Dr. Martin, Dr. Hattlestad and/or Dr. McChesney told Ms. House she would be terminated after the 1986–87 school year if tenure were denied or the application were withdrawn, is in dispute. This fact, however, is immaterial to plaintiff's property interest claim because lack of notice of termination could not have given Ms. House a legitimate expectation of continued employment under the circumstances. It is undisputed that the Faculty Handbook, which plaintiff had access to and was familiar with, provides for termination in either case. Therefore, Ms. House's only legitimate expectation after she withdrew the application for tenure was that she would be terminated after the next school year. A dispute over an immaterial fact will not preclude the entry of summary judgment. *Anderson supra.*

The UCA Board of Trustees held a regular meeting on April 17, 1986, to discuss, among other things promotions and tenurial appointments. The names of the faculty members receiving a positive recommendation for tenure were listed in the minutes with a "(T)" beside their names. No "(T)" appeared next to "Patricia House". [Defendants' Ex. B]. Ms. House's rank is listed in the minutes as "Instructor".

On March 1, 1986, Dr. McChesney sent a memorandum to the University President, Dr. Jefferson Farris, regarding the Trustees' promotion and tenure recommendations. [Defendants' Attachment No. 6]. The memo indicates Ms. House received negative recommendations for tenure and promotion at each stage of the application process until she withdrew her application. [Defendants' Attachment No. 6].

On April 18, 1986, plaintiff received an appointment letter for the August, 1986, to May, 1987, school year. The letter which classified plaintiff at the rank of instructor was marked as follows:

_____ appointment with tenure
 x  tenure-track appointment
_____ term appointment
_____ terminal appointment

[Defendants' Ex. B]. Ms. House signed and returned the contract to the appropriate UCA office. She did not question the tenure-track appointment even though she now vehemently contends the UCA Faculty Handbook required she be granted *either* tenure or a termination contract following her sixth year in tenure track employment. No one disputes that a teacher granted tenure would have received an appointment letter with the blank labeled "appointment with tenure" checked.

Sometime in April, 1987, Dr. Martin asked Ms. House about her future plans. Ms. House said she planned to stay at UCA because she had been granted tenure. An investigation prompted by Dr. Martin revealed the clerical error on the appointment letter; instead of "terminal appointment", the blank beside "tenure-track" had been checked.

At the Board of Trustees' regular meeting on April 24, 1987, the mistake was discussed and a proposal was made to award Ms. House a special tenured contract. Three trustees voted for tenure; one voted against tenure; and one abstained from voting. [Plaintiff's Ex. B]. Ms. House's husband learned of the Trustees' action on the evening of April 24, 1987, and told his wife about the decision. The results of the meeting were reported in the Log Cabin Democrat, a local newspaper, on April 26, 1987, but Ms. House was not mentioned by name.

The local newspaper continued to follow the story which became more newsworthy with the intervention of the UCA Faculty Senate. The Faculty Senate agreed to study a proposed memorandum that asked the Trustees to "rescind or reconsider" their award of tenure to Ms. House because of the precedent it set for future deviations from the Faculty Handbook procedures. [Log Cabin Democrat April 28, 1987]. The information reported in the newspaper was readily available to the public.

The morning after the Board meeting in which three Trustees voted to grant Ms. House tenure, UCA legal counsel told the Trustees that he believed the vote was invalid under Ark.Stat.Ann. § 80-2609 (currently codified at Ark.Code Ann. § 6-67-107 (1987)). This statute reads:

Powers of board in relation to university —The said board shall prescribe the course of study for the university, shall elect instructors and fix their salaries and determine the conditions, subject to limitations hereinafter specified, on which pupils shall be admitted to the privileges of the school, but no election shall be valid unless at least four [4] members of the board shall vote in favor of the applicant whose name is being considered.

A special Board meeting was called for May 8, 1987, to resolve the matter. Ms. House was notified of the meeting by letter of May 1, 1987, which included the following statements:

The purpose of the meeting will be to discuss your future employment status

with the University. The Board would like to invite you to be present at the meeting to present any information which you feel is appropriate and to answer questions posed by members of the Board. If you wish for any reason to be accompanied by counsel, there will be no objection. Please understand, however, that the meeting will not be a "public hearing" where witnesses are called or cross examination takes place. The Board will simply ask questions of selected persons in order to gain a better understanding of the situation.

[Defendants' Ex. A].

At the meeting, a twenty-one page document in support of plaintiff's position was presented to the Trustees by Ms. House's attorney. Ms. House was given an opportunity to address the Trustees in executive session. After reviewing the evidence presented, the Trustees voted to extend to Ms. House a one year terminal contract for the August, 1987, to May, 1988, school year. [Defendant's Ex. C]. The Log Cabin Democrat reported that the Trustees voted to rescind the award of tenure to Ms. House and that she was offered a one year terminal contract. [Log Cabin Democrat, May 10, 1986]. Ms. House rejected the offer and terminated her employment with UCA on May 15, 1987.

### Discussion

Plaintiff alleges in the complaint that she was deprived of her Constitutional right to procedural due process by the following acts of defendants:

1. failure to give her notice of the reasons for terminating her contract of employment;
2. failure to give her a meaningful pre-termination hearing;
3. failure to give her a post-termination hearing upon her request; and
4. making stigmatizing statements about her to the press.

Plaintiff is entitled to procedural due process of law only if she was deprived of an interest in property or an interest in liberty. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972);

*Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Buhr v. Buffalo Public School District No. 38*, 509 F.2d 1196 (8th Cir.1974). The first inquiry then, is whether Ms. House held a property interest in her position as an instructor at UCA.

*Property Interest in Continued Employment*

■ To have a property interest in her teaching position at UCA, Ms. House must have more than a unilateral expectation of continued employment. *Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709. She must, instead, demonstrate a legitimate claim of entitlement to it. *Id.* Property interests do not arise from the guarantees of the Constitution, but rather are created and defined by existing rules or understandings that stem from an independent source such as state statutes which secure certain benefits and which support claims of entitlement to those benefits. *Roth, supra.*

■ A legitimate claim of entitlement to continued employment may also be created by mutually explicit understandings with an employer that support the employee's claim of a property interest. *Sindermann, supra.* For example, a written contract with an explicit tenure provision is evidence of a formal understanding supporting a claim of entitlement to continued employment unless there is sufficient reason to challenge the validity of the contract. *Sindermann, supra.* A less formal example would be where the policies and procedures of the employer support a legitimate expectation of continued employment. *Sindermann, supra.*

■ Ms. House relies on the UCA Faculty Handbook and two undisputed acts of UCA officials to support her claim of a property interest in continued employment at the University. First, Ms. House contends she was granted *de facto* tenure when UCA officials issued her a tenure track appointment for an additional year beyond the required six years in the faculty handbook. Second, it is alleged that the vote by three Trustees to award Ms. House tenured status on April 24, 1987, was suffi-

cient to confer a legitimate expectation of tenure when it was informally communicated to Ms. House even though the vote's validity was later challenged. If either of these incidents, combined with the policies and procedures set forth in the faculty handbook, validly conferred a legitimate expectation of continued employment as a tenured faculty member on Ms. House, then she was entitled to procedural due process before being issued a one-year terminal contract.

Based upon the undisputed facts, the court concludes Ms. House had no legitimate expectation of continued employment beyond the 1986–87 school year when she received the appointment letter marked "tenure-track". The UCA Faculty Handbook gives an employee two mutually exclusive expectations for employment after the sixth year as a tenure track appointee: tenured status or a one year terminal contract. Ms. House's prospects for the tenure option dimmed early in 1986 when she learned from Dr. McChesney that she had been given negative recommendations at every stage in the application process. Dr. McChesney informed Ms. House that withdrawal of the application would clear her employment record of the negative recommendations. Realizing her chances for promotion and tenure were slim, Ms. House withdrew her application from consideration extinguishing any chance for achieving tenured status.

In February, when Ms. House withdrew her application, she was well aware that she had not achieved the rank of Assistant Professor, a prerequisite to tenure. In addition, she had not received nor had she requested special dispensation from Dr. McChesney to pursue tenured status from the rank of instructor, an exception to the requirement that she first achieve the rank of Assistant Professor to be awarded tenure. For Ms. House then, only one legitimate expectation remained; a one year terminal contract.

Accordingly, when Ms. House received a tenure track appointment for the August, 1986, to May, 1987, school year, she had every reason to believe an error had been made in the appointment letter. Ms. House knew she was eligible for only one more year's service at UCA under the rules set forth in the faculty handbook. A teacher is prohibited from serving more than seven years in tenure track so Ms. House knew she was not being awarded a new six year probationary period in the tenure track. In addition, a tenure track employee must receive either tenure or be terminated at the end of the seventh term appointment. Thus, when Ms. House received the tenure track appointment, she could only have expected that a mistake had been made.

In light of the surrounding circumstances, the error in the letter did nothing to alter Ms. House's inherent understanding that the 1986–87 school year would be her last. Likewise, the fact that Ms. House was not informed of termination orally or in writing does nothing to create a *legitimate* expectation of continued employment. She was put on notice that she would receive a terminal contract for the seventh year by the provisions in the handbook. The handbook only gave her the expectation that if she was either denied or chose not to seek tenure she would be terminated following her next school year.

Since no legitimate expectation of tenured status existed at this point, no property interest in continued employment existed and no procedural due process was required to remove the error and issue Ms. House a one year terminal contract. There is no genuine dispute as to any policy or procedure at UCA which would require submission of the *de facto* tenure issue to the jury. Ms. House relies solely on the undisputed provisions of the UCA handbook which clearly do not support her position.

■ The undisputed facts also negate Ms. House's position that a property interest in tenured status arose from the vote by three Trustees on April 24, 1986, to award her a special tenured contract. Since the requisite four votes needed to comply with Ark.Stat.Ann. § 80–2609 were lacking, the action was, in effect, a nullity. "To have a property interest in a benefit, a person clearly must have more than an

abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

Because the vote was statutorily invalid it could not have conveyed a *legitimate* expectation of continued employment upon Ms. House. The fact that she learned of the Board's action through informal sources does not and, in fact, cannot legitimize the vote. The language of the statute is unambiguous: "no election shall be valid unless at least four [4] members of the board shall vote in favor of the applicant whose name is being considered." Ark. Stat.Ann. § 80–2609. Ms. House's knowledge of the vote merely gave her a unilateral expectation which is insufficient to support a protectible property interest.

■ Even if the vote of the Board was not rendered invalid by Ark.Stat.Ann. § 80–2609, the court believes Ms. House received all the process to which she was due prior to termination. All that federal due process requires is that Ms. House "be given notice and an opportunity to be heard prior to termination." *Id.* The court believes the University fully satisfied these Constitutional requirements for notice and a hearing before they offered Ms. House a one year terminal contract.

■ Ms. House does not dispute that she received notice of the special meeting of the Board of Trustees as well as the opportunity to present evidence on her own behalf before the Trustees voted to offer her a one year terminal contract. No more process was due. Termination after notice and hearing is not a deprivation cognizable under 42 U.S.C. § 1983, for "only deprivations without due process are actionable." *Phillips v. Vandygriff,* 711 F.2d 1217, 1222 (5th Cir.1983), *cert. denied* 469 U.S. 821, 105 S.Ct. 94, 83 L.Ed.2d 40 (1984).

Even though Ms. House was not deprived of a property interest without due process of law, she may still be able to recover on her complaint if the undisputed facts support her claim that she was deprived of a liberty interest without due process of law.

*Liberty Interest*

■ To be deprived of a liberty interest Ms. House must show that UCA's decision to revoke tenure and issue her a one year terminal contract imposed a stigma on her foreclosing future employment opportunities or damaging her standing and association in the community. *Buhr v. Buffalo Public School District No. 38,* 509 F.2d 1196, 1199 (8th Cir.1974); *Cochran v. Chidester School District,* 456 F.Supp. 390, 395 (W.D.Ark.1978). The decision to revoke tenure by itself does not constitute a deprivation of an interest in liberty. *Board of Regents v. Roth,* 408 U.S. at 574 n. 13, 92 S.Ct. at 2707 n. 13; *Calvin v. Rupp,* 471 F.2d 1346, 1348 (8th Cir.1973). "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains free as before to seek another." *Board of Regents v. Roth,* 408 U.S. at 575, 92 S.Ct. at 2708, citing *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895–96, 81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230 (1961).

If, however, the reasons for nonrenewal are announced publicly or are incorporated into a record made available to prospective employers, the reasons may affect a teacher's chances of securing another job. *Buhr v. Buffalo Public School District No. 38, supra* at 1199; *Wellner v. Minnesota State Junior College Board,* 487 F.2d 153 (8th Cir.1973). In such a situation, adequate notice of the reasons for nonretention and an opportunity to rebut those charges are required. *Buhr, supra* at 1199.

■ Ms. House has alleged that public statements to the press implied wrongdoing on her part in the initial grant of a tenure track appointment. She claims these statements stigmatized her chances of securing future employment in the teaching field. Specifically, Ms. House contends her "employment opportunities have been impaired in that she has been reluctant to apply for a teaching job because of a fear she would not get a good

recommendation from the University of Central Arkansas." [Plaintiff's Brief at 7].

The court does not believe reasonable minds could differ on the question whether the newspaper reports harmed Ms. House's professional reputation. The articles merely conveyed public information which anyone in the community could have had access to. University officials did no more than "state the truth" when specifically asked about the Board's actions which were already public information. This cannot, under the law, give rise to a Constitutional violation. *Karr v. Townsend,* 606 F.Supp. 1121, 1131 (W.D.Ark.1985). Further, undisputed comments of University officials in no way implied wrongdoing on Ms. House's part. In fact, the published accounts made the University look far worse than Ms. House.

Since plaintiff has failed to demonstrate on the basis of undisputed facts that the statements to the press by UCA officials stigmatized her in any manner, she has not met an essential element of proof required to succeed on her deprivation of liberty claim. *Payne v. Ballard,* 761 F.2d 491 (8th Cir.1985). A summary judgment is mandated in such a case by a recent opinion of the United States Supreme Court. In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court held:

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

106 S.Ct. at 2552–53.

Even if the court were to find the statements harmed Ms. House, she was given ample opportunity to speak on her own behalf to clear her name of any stigma created by the University's handling of the situation. Due process simply requires nothing more.

Accordingly, the defendants' motion for summary judgment will be granted and the complaint dismissed in its entirety with prejudice.